LINC GOVERNMENT SERVICES, LLC, Plaintiff,

and

J&J Maintenance, Inc., Plaintiff-Intervenor,

v.

The UNITED STATES, Defendant,

and

Global Engineering & Construction, LLC, Defendant-Intervenor,

URS Group, Inc., Defendant-Intervenor,

ITSI Gilbane Company, Defendant-Intervenor,

United Excel Corporation, Defendant-Intervenor.

No. 12-522

United States Court of Federal Claims.

Filed under seal: December 28, 2012 *

Reissued for publication: December, 28, 2012

---

* On December 21, 2012, the court forwarded a sealed copy of this Memorandum Opinion and Order to the parties to delete from the public version any confidential and/or privileged information, and note any citation or editorial errors requiring correction. The court has incorporated some of these comments and corrected or clarified certain portions herein.

Sean D. Forbes and Bryant Banes, Neel, Hooper & Banes, P.C., Houston, Texas, Counsel for Plaintiff, Linc Government Services, LLC.

James F. Nagle, Oles, Morrison, Seattle, Washington, Counsel for Plaintiff–Intervenor, J & J Maintenance, Inc.

Stacey K. Grigsby, United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.

Johnathan M. Bailey, Bailey & Bailey, P.C., San Antonio, Texas, Counsel for Defendant–Intervenor, Global Engineering & Construction, LLC.

Kevin P. Connelly, Vedder Price P.C., Washington, D.C., Counsel for Defendant–Intervenor, URS Group, Inc.

Richard B. Oliver, McKenna Long & Aldridge, LLP, Los Angeles, California, Counsel for Defendant–Intervenor, ITSI Gilbane Company.

George S. Ruprecht, Brown & Ruprecht, P.C., Kansas City, Missouri, Counsel for Defendant–Intervenor, United Excel Corporation.

Bid Protest; Competition in Contracting Act, 5 U.S.C. § 706(2) (2006); 28 U.S.C. § 1491(b)(1), (4) (2006); 28 U.S.C. § 2201 (2006); 41 U.S.C. § 3301 (2006); Federal Acquisition Regulation 1.102(b)(3), 48 C.F.R. § 1.102(b)(3) (requiring integrity, fairness, and openness in procurement process); 1.602–2(b), 48 C.F.R. § 1.602–2(b) (requiring the contracting officer to ensure impartial, fair, and disparate treatment); 9.504(a), 48 C.F.R. § 9.504(a) (requiring the contracting officer to avoid, neutralize, or mitigate significant potential conflicts); 14.405, 48 C.F.R. § 14.405 (allowing the contracting officer to waive deficiencies as to minor irregularities); 15.000–.609, 48 C.F.R. § 15.000–.609 (negotiated acquisitions); 15.101–1(c), 48 C.F.R. § 15.101–1(c) (allowing tradeoffs among cost or price and non-cost factors); 15.207(b), 48 C.F.R. § 15.207(b) (prohibiting agency disclosure of proprietary information); 15.306(d)(3), 48 C.F.R. § 15.306(d)(3) (prescribing the content of discussions between the agency and the offeror); 15.306(e)(2), 48 C.F.R. § 15.306(e)(2) (prohibiting agency disclosure of an offeror's proprietary proposal concepts); 15.404–1(b), (d)(3), 48 C.F.R. §§ 15.404–1(b), (d)(3) (price realism analysis); 36.300–36.303–2, 48 C.F.R. § 36.300–36.303–2 (two-phase design-build process); 52.229–3, 48 C.F.R. § 52.229–3 (offerors responsible for determining if a tax exemption is available); Preliminary Injunction, RCFC 65(a); Standing; RCFC 52.2(b) (remand orders).

## MEMORANDUM OPINION AND ORDER [1]

BRADEN, Judge.

The September 22, 2010 initial Solicitation for this two-phase government contract was amended ten times.[2] Phase I finalists were selected by the Department of the Army ("the Army") on February 1, 2011. On July 8, 2011, a first protest was filed in the United States Court of Federal Claims by Linc Government Services LLC ("Linc") challenging the Army's decisions. Following a Notice of Corrective Action, that case was dismissed. *See Linc Gov't Servs., LLC v. United States,* No. 11–CV–0451 (Fed.Cl. Aug. 18, 2011). During the next year, the Phase II evaluation took place and Multiple Award Task Order Contracts ("MATOC Contracts") were awarded to five firms. Since Linc was not selected, on August 20, 2012, it filed this second bid protest.

■ The United States Court of Appeals for the Federal Circuit has emphasized that "best value" solicitations, such as the one at issue here, afford the contracting officer a great deal of discretion, "so that the relative merit of competing proposals is primarily a matter of administrative discretion[.]" *Galen Med. Assoc. Inc. v. United States,* 369 F.3d 1324, 1330 (Fed.Cir.2004). That discretion, however, does not allow the procuring agency the liberty to deviate from the Solicitation's requirements, ignore applicable Federal Acquisitions Regulations ("FAR"), or ascertain "best value" in a manner that is arbitrary. Nor does that discretion allow the court to overlook the fact that the Administrative Record does not contain sufficient information on which an agency could even make a rational procurement decision. *See* Vernon J. Edwards, *Complexity and Incompetence: The Revelations of a Failed Acquisition,* NASH & CIBINIC REPORT, Dec. 2012, at 186 (describing incompetence and mismanagement in the procurement process). But, that is what happened in this case.

To facilitate a review of this Memorandum Opinion and Order, the court has provided the following outline:

---

**1.** The relevant facts discussed herein were derived from the August 20, 2012 Complaint ("Compl.") and the Administrative Record ("AR 1–8019").

**2.** AR Tab 4 at 263; AR Tab 5 at 308; AR Tab 33 at 3995; AR Tab 35 at 4181; AR Tab 79 at 5025; AR Tab 80 at 5076; AR Tab 81 at 5093; AR Tab 82 at 5110; AR Tab 83 at 5126; AR Tab 84 at 5150.

I. RELEVANT FACTUAL BACK-GROUND.

 A. The Initial September 22, 2010 Solicitation.

 B. The Phase I Proposals And Case No. 11–CV–0451.

 C. The Phase II Proposals.

II. PROCEDURAL HISTORY.

III. DISCUSSION.

 A. Jurisdiction.

 B. Standing.

 C. Applicable Standard Of Review.

 D. Issues Raised By Plaintiff's Motion For Judgment On The Administrative Record.

 1. The Army's Price Realism Analysis.

 a. The Plaintiff's Argument.

 b. The Government's Response.

 c. The Court's Resolution.

 2. The Army's Assessment Of The Risk Management Plan.

 a. The Plaintiff's Argument.

 b. The Government's Response

 c. The Court's Resolution.

 3. The Army's Evaluation Of Proposed "Betterments."

 a. The Plaintiff's Argument.

 b. The Government's Response.

 c. The Court's Resolution.

 i. Smoke Detectors.

 ii. Special Method For Installing Insulation.

 iii. Floor And Wall Covering Finishes.

 iv. Experienced Personnel.

 v. Fire Sprinkler System Flow Test.

 vi. Early Involvement Of Specialty Subcontractors.

 vii. Safety Meetings.

 viii. ISO Certification.

 ix. Systems Testing.

 x. Training.

 xi. Close–Out Documentation.

 xii. Risk Management Plan.

 xiii. Low–Flow Toilets.

 xiv. Fast Track Plan.

 xv. Occupancy Sensors To Control Lighting.

 xvi. Mold-Resistant Drywall.

 xvii. Additional Personnel.

 xviii. Scheduling.

 xix. Multipurpose Areas.

 xx. Small-Business Participation.

 E. Issues Raised By Plaintiff–Intervenor's Motion For Judgment On The Administrative Record.

 1. The Army's Price Realism Analysis.

 a. The Plaintiff-Intervenor's Argument.

 b. The Government's Response.

 c. Defendant–Intervenor [redacted]'s Response.

 d. The Court's Resolution.

 2. The Army's Failure To Raise Affordability.

 a. The Plaintiff–Intervenor's Argument.

 b. The Government's Response.

 c. The Court's Resolution.

 3. The Army's Acceptance Of Blank Line Items.

 a. The Plaintiff–Intervenor's Argument.

 b. The Government's Response.

 c. Defendant–Intervenor [redacted]'s Response.

 d. The Court's Resolution.

 4. The Army's Acceptance Of $0 Line Items.

 a. The Plaintiff–Intervenor 's Argument.

 b. The Government's Response.

 c. Defendant–Intervenor [redacted]'s Response.

 d. The Court's Resolution.

 5. The Army's Acceptance Of A $0 Tax Line Item.

a. The Plaintiff–Intervenor's Argument.

b. The Government's Response.

c. Defendant–Intervenor [redacted]'s Response.

d. The Court's Resolution.

6. **The Army's Failure To Recognize That An Offeror Had Unequal Access To Information And To Mitigate.**

a. The Plaintiff–Intervenor's Argument.

b. The Government's Response.

c. The Court's Resolution.

7. **The Army's Best Value Tradeoff.**

a. The Plaintiff–Intervenor's Argument.

b. The Government's Response.

c. The Court's Resolution.

8. **The Army's Reliance On Raw Price As A Discriminator.**

a. The Plaintiff–Intervenor's Argument.

b. The Government's Response.

c. The Court's Resolution.

9. **The Army's Evaluation Of Non–Price Items.**

a. The Plaintiff–Intervenor's Argument.

b. The Government's Response.

c. The Court's Resolution.

F. A Preliminary Injunction Is Warranted.

**IV. CONCLUSION.**

\* \* \*

## I. RELEVANT FACTUAL BACKGROUND.

### A. The Initial September 22, 2010 Solicitation.

On September 22, 2010, the United States Army Engineering & Support Center ("Army") issued Solicitation No. W912DY–10–R–0005 for the first of a two-phase design-build contract, pursuant to FAR §§ 36.300 to 36.303-2 ("the Solicitation").

AR Tab 3 at 114, 116. The Army advised potential bidders that the procurement would result in a design-build Multiple Award Task Order for medical facilities in the United States and overseas. AR Tab 3 at 114. In Phase I, six offerors would be selected to compete for an Indefinite Delivery, Indefinite Quantity Contract in Phase II. AR Tab 3 at 116.

Phase I proposals would be evaluated by four factors: (1) Corporate Medical Experience (most important factor); (2) Past Performance (slightly less important than Factor 1); (3) Organizational and Management/Technical Approach (slightly less important than Factor 2); and (4) Evidence of Bondability (a "go or no-go" factor). AR Tab 3 at 153. The Army then would rate each proposal against the evaluation factor criteria listed in the Solicitation. AR Tab 3 at 160. After "listing all strengths or advantages, weaknesses or disadvantages, deficiencies, and required clarifications[,]" the Army would assign a rating of "outstanding," "good," "acceptable," "marginal," "susceptible to being made acceptable," or "unacceptable" for each factor, except Past Performance. AR Tab 3 at 160. Past Performance was to be rated per the following designations: "unknown risk;" "low risk;" "moderate risk;" and "high risk." AR Tab 3 at 162.

In Phase II, proposals would be evaluated, pursuant to Federal Acquisition Regulations ("FAR") part 15, on the basis of "best overall value to the Government, considering the price and non-price factors" in the Solicitation. AR Tab 83 at 5131; *see also* FAR 15.000 to –.609. "All evaluation factors other than cost or price, when combined, are significantly more important than cost or price." AR Tab 83 at 5131. Betterments and innovations were to be evaluated on the basis of whether they added value to the Army. AR Tab 83 at 5131. The four factors considered were: (1) Design Technical (the most important factor); (2) Specialized Experience (slightly less important than Factor 1); (3) Remaining Performance Capability (slightly less important than Factor 2); (4) Price (slightly less important than Factor 3). AR Tab 3 at 180. In Phase II, Phase I ratings would be used only as part of a "tiebreaker

process ... to differentiate between essentially equal competitive offerors." AR Tab 83 at 5131.

**B.** The Phase I Proposals And Case No. 11–CV–0451.

In response to the September 23, 2010 Solicitation, as amended, the Army received twenty-seven proposals. AR Tabs 6–32 at 329–3994. In this case, the proposals of seven offerors are at issue: Linc Government Services, LLC ("Linc"); J & J Maintenance, Inc. ("J & J"); Global Engineering & Construction, LLC ("Global"); ITSI Gilbane Company ("ITSI"); John J. Kirlin, Inc. ("Kirlin"); United Excel Corporation ("United"); and URS Group, Inc. ("URS").

The following chart summarizes the Army's January 18, 2011 evaluation of the Phase I proposals at issue:

| Offeror | Corporate Medical Experience | Past Performance | Organizational & Management/Technical | Evidence of Bondability |
|---------|------------------------------|------------------|----------------------------------------|-------------------------|
| J&J | ▮ | ▮ | ▮ | ▮ |
| Linc | ▮ | ▮ | ▮ | ▮ |
| Global | ▮ | ▮ | ▮ | ▮ |
| ITSI | ▮ | ▮ | ▮ | ▮ |
| Kirlin | ▮ | ▮ | ▮ | ▮ |
| United | ▮ | ▮ | ▮ | ▮ |
| URS | ▮ | ▮ | ▮ | ▮ |

AR Tab 36 at 4188 (summary); AR Tab 36 at 4254–58(J & J); AR Tab 36 at 4274–79 (Linc); AR Tab 36 at 4232–36 (Global); AR Tab 36 at 4248–53 (ITSI); AR Tab 36 at 4264–68 (Kirlin); AR Tab 36.1 at 4296.12–.16 (United)[3]; AR Tab 36.1 at 4296.17–.22 (URS)[4].

On February 1, 2011, the Army rejected Linc's Phase I proposal. AR Tab 59. On February 11, 2011, Linc filed a protest with the Government Accountability Office ("GAO"). AR Tab 73 at 4858. On March 21, 2011, Linc filed a supplemental protest with the GAO. AR Tab 75 at 4990. On May 23, 2011, the GAO denied both of Linc's protests. AR Tab 78 at 5016–24.

On July 8, 2011, Linc filed a Complaint in the United States Court of Federal Claims seeking declaratory and injunctive relief against the United States ("the Government").

On August 17, 2011, the Government filed a Notice Of Corrective Action And Motion To Dismiss, together with an Exhibit (Aug. 17, 2011 Source Selection Authority Dec. stating that Linc could participate in Phase II of the proposal submission process, and would be put "in the same position as the other firms currently in Phase II").

On August 18, 2011, the court granted the Government's Motion To Dismiss Case No. 11–CV–0451.

**3.** Source Selection Evaluation Board ("SSEB") Consensus Proposal Evaluation Worksheets for United's Phase I proposal are missing from the Administrative Record. The Government's unopposed August 29, 2012 Motion For Leave To File A Corrected Record proposes supplementing the Administrative Record with those worksheets. 8/29/12 Gov't Mot. Supp. AR, Ex. 1 at AR 4296.12–.16. The Court hereby grants the Government's August 29, 2012 Motion regarding AR 4296.12–.16.

**4.** The SSEB Consensus Proposal Evaluation Worksheets for URS's Phase 1 proposal are missing from the Administrative Record. The Government's unopposed August 29, 2012 Motion For Leave To File A Corrected Record proposes supplementing the Administrative Record with those forms. 8/29/12 Gov't Mot. Supp. AR, Ex. 1 at AR 4296.17–.22. The court hereby grants the Government's August 29, 2012 Motion regarding AR 4296.17–.22.

C. The Phase II Proposals.

On May 24, 2011, the six offerors that the Army selected in Phase I submitted Phase II proposals. AR Tab 87 at 5190–5452 (J & J); AR Tab 88 at 5453–5638 (Kirlin); AR Tab 89 at 5639–95 (United); AR Tab 90 at 5696–5786 (URS); AR Tab 91 at 5787–5882 (Global); AR Tab 92 at 5883–6022 (ITSI). On September 22, 2011, Linc submitted its Phase II proposal. AR Tab 100 at 6388–6514.

The following chart summarizes the Army's February 14, 2012 evaluation of the Phase II proposals at issue in this case:

| Offeror | Design/Technical Approach | Specialized Experience | Schedule/Key Personnel | Small Business Participation Plan | Price |
|---------|---------------------------|------------------------|------------------------|----------------------------------|-------|
| J&J | ■ | ■ | ■ | ■ | ■ |
| Linc | ■ | ■ | ■ | ■ | ■ |
| Global | ■ | ■ | ■ | ■ | ■ |
| ITSI | ■ | ■ | ■ | ■ | ■ |
| Kirlin | ■ | ■ | ■ | ■ | ■ |
| United | ■ | ■ | ■ | ■ | ■ |
| URS | ■ | ■ | ■ | ■ | ■ |

AR Tab 123 at 7137, 7155–60 (J & J); AR Tab 123 at 7137, 7171–75 (Linc); AR Tab 123 at 7137, 7139–43 (Global); AR Tab 123 at 7137, 7144–48 (ITSI); AR Tab 123 at 7137, 7149–54 (Kirlin); AR Tab 123 at 7137, 7161–65 (United); AR Tab 123 at 7137, 7166–70 (URS).

Based on the above referenced evaluations and the Source Selection Authority's May 22, 2012 Decision Document (AR Tab 128 at 7285–99), on July 11, 2012, the Army awarded Multiple Award Task Order Contracts (MATOC Contracts) to Global, ITSI, Kirlin, United, and URS (AR Tab 136 at 7342; AR Tab 137 at 7410; AR Tab 138 at 7478; AR Tab 139 at 7548; AR Tab 140 at 7615) and informed Linc and J & J that they were not awarded contracts (AR Tab 141 at 7683; AR Tab 142 at 7686).

## II. PROCEDURAL HISTORY.

On August 20, 2012, Linc filed a second Complaint in the United States Court of Federal Claims alleging that the Army's failure to award Linc a MATOC Contract on July 11, 2012 violated the Competition in Contracting Act of 1984, specifically 41 U.S.C. § 253(a),[5] and seeking declaratory and injunctive relief against the Government and attorneys' fees ("Compl."). On that date Global Engineering and Construction, LLC ("Global") filed an unopposed Motion To Intervene as a Defendant–Intervenor, that the court granted on the same date.

On August 21, 2012, the Government filed the Administrative Record. On August 21, 2012, URS also filed an unopposed Motion To Intervene as a Defendant–Intervenor, that the court granted on the same date. On August 29, 2012, the Government filed an unopposed Motion To Correct And Supplement The Administrative Record, that the

---

5. The language of 41 U.S.C. § 253(a) (2006) may now be found at 41 U.S.C. § 3301 and provides, in relevant part:

 (1) Except as provided in subsections (b), (c), and (g) and except in the case of procurement procedures otherwise expressly authorized by statute, an executive agency in conducting a procurement for property or services—

 (A) shall obtain full and open competition through the use of competitive procedures in accordance with the requirements of this division [41 U.S.C. §§ 251 et seq.] and the Federal Acquisition Regulation[.]

41 U.S.C. § 3301.

court granted on the same date. On September 12, 2012, the Government also filed an unopposed Motion To Amend/Correct The Administrative Record ("9/12/12 Gov't Mot."). [6]

On August 30, 2012, J & J filed a Motion To Intervene and a Motion For Leave To File Proposed Complaint–In–Intervention ("Compl.-Int."). J & J's nine-count Complaint–In–Intervention alleges that the Army's discussions with J & J were misleading and that the Army failed to evaluate J & J's bid properly, relied on incorrect information, deviated from its stated evaluation criteria, and improperly awarded one or more contracts to offerors with proposals that contained deficiencies or were outside the competitive range. Compl.-Int. ¶¶ 10–23. On August 31, 2012, the Government filed a Response. On September 4, 2012, J & J filed a Reply and the court granted J & J's motion to intervene.

On August 31, 2012, ITSI filed an unopposed Motion To Intervene as a Defendant–Intervenor. On September 4, 2012, the court granted ITSI's motion.

On September 6, 2012, United Excel Corporation ("United") filed an unopposed Motion To Intervene as a Defendant–Intervenor. On that same date, the court granted that motion.

On September 19, 2012, Linc filed a Motion For Judgment On The Administrative Record ("Pl. Mot. JAR"). On September 19, 2012, J & J filed a Motion For Judgment On The Administrative Record ("Pl.–Int. Mot. JAR"). On September 28, 2012, the Government filed a Response And Cross Motion For Judgment On The Administrative Record ("Gov't Resp. to Pl.") and a Response To Intervenor–Plaintiff's Motion For Judgment On The Administrative Record and A Cross Motion ("Gov't Resp. to Pl.–Int.").

On September 28, 2012, Defendant–Intervenor ITSI filed a Response To Plaintiff's [September 19, 2012] Motion And [A] Cross Motion For Judgment On The Administrative Record and a Response To Plaintiff–Intervenor's Motion And Cross Motion For Judgment On The Administrative Record ("ITSI Resp. to Pl.–Int."). On that date, Defendant–Intervenor Global also filed a Cross Motion For Judgment On The Administrative Record And Response To Plaintiff's [September 19, 2012] Motion ("Global Resp. to Pl.") and a Cross Motion For Judgment On The Administrative Record And Response To Plaintiff–Intervenor's Motion ("Global Resp. to Pl.–Int."). On September 28, 2012, United filed an Opposition To Plaintiff's Motion For Judgment Upon The Administrative Record and a Cross–Motion For Judgment On The Administrative Record ("United Resp. to Pl.").

On October 5, 2012, Linc filed a Motion To Strike Extra–Record Testimony & Documents. On October 22, 2012, the Government filed a Response. On November 1, 2012, Linc filed a Reply.

On October 5, 2012, Linc also filed a Motion To Supplement The Administrative Record And To Conduct Additional Discovery ("Pl. Mot. Supp."). On October 25, 2012, the Government filed a Response. On November 5, 2012, Linc filed a Reply. [7]

On October 12, 2012, Linc filed a consolidated Reply and Response ("Pl. Reply"). On October 12, 2012, Plaintiff–Intervenor, J & J also filed a consolidated Reply and Response ("Pl.–Int. Reply"). On October 19, 2012, URS filed a Reply to Plaintiff's [October 12, 2012] Response and a Reply to Plaintiff–Intervenor's Response ("URS Reply to Pl.–Int."). On October 19, 2012, the Government filed a Reply to Plaintiff's Response ("Gov't

---

6. The Government's September 12, 2012 Motion corrects omissions of documents upon which the Army relied during the source selection process. 9/12/12 Gov't Mot. at 2. Those documents include J & J's Final Revised Price Proposal, omitted portions of Kirlin's Phase II proposal, and minor errors in the electronic copies of United's and Global's Phase II proposals. 9/12/12 Gov't Mot. at 2. The Government's September 12, 2012 Motion is granted.

7. Linc's October 5, 2012 Motion seeks to supplement the Administrative Record with documents relevant to the harm that injunctive relief would cause the Government and to depose Government affiant Wesley Turner regarding those documents. Pl. Mot. Supp. 1–3. Because the court did not require those documents or further information from Mr. Turner for its analysis, Linc's October 5, 2012 Motion is moot.

Reply to Pl.") and a Reply to Plaintiff–Intervenor's Response ("Gov't Reply to Pl.–Int."). On October 19, 2012, Defendant Intervenor Global filed a consolidated Reply to Plaintiff's Response and Plaintiff–Intervenor's Response. On October 19, 2012, ITSI also filed a Reply to Plaintiff's October 12, 2012 Reply and Response and a Reply to Plaintiff–Intervenor's Response.

On December 14, 2012, the court informed the parties in a telephone conference that the procurement would be remanded to the Army and a preliminary injunction would issue. On December 19, 2012, the court convened a hearing by a telephone conference to clarify the court's reading that the August 20, 2012 Complaint requested relief by a preliminary injunction and ascertain whether a bond was required. In light of the Government's failure to evidence any specific damage, since no action had been taken to award specific work to the recipients of the MATOC Contracts, the court ascertained no basis to request a bond.

## III. DISCUSSION.

### A. Jurisdiction.

Pursuant to 28 U.S.C. § 1491(b)(1) (2006), the United States Court of Federal Claims has jurisdiction,

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

*Id.*

■ The August 20, 2012 post-award bid protest Complaint in this case alleges that the Army's July 11, 2012 award of MATOC Contracts to Global, ITSI, Kirlin, United, and URS violated 41 U.S.C. § 253(a) (2006), because the Army did not comply with applica-

ble procurement regulations. Compl. ¶¶ 56–61.

Accordingly, 28 U.S.C. § 1491(b)(1) authorizes the court to adjudicate the claims alleged in the August 20, 2012 Complaint.[8]

### B. Standing.

■ As a threshold matter, a plaintiff contesting an award of a federal contract must establish that it is an "interested party" to have standing under 28 U.S.C. § 1491(b)(1). *See Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d 1366, 1369 (Fed.Cir.2002) ("[S]tanding is a threshold jurisdictional issue."). The United States Court of Appeals for the Federal Circuit has construed the term "interested party" to be synonymous with the definition of "interested party" provided in 31 U.S.C. § 3551(2)(A). *See Rex Serv. Corp. v. United States,* 448 F.3d 1305, 1307 (Fed.Cir.2006) (citing decisions adopting the Competition in Contracting Act definition of "interested party" to convey standing under 28 U.S.C. § 1491(b)(1)). Our appellate court has provided a two-part test to determine whether a protester is an "interested party"; a protestor must establish that: "(1) it was an actual or prospective bidder or offeror, and (2) it had a direct economic interest in the procurement or proposed procurement." *Distrib. Solutions, Inc. v. United States,* 539 F.3d 1340, 1344 (Fed.Cir.2008). In this case, the court has determined that Linc, J & J, Global, ITSI, and URS were actual offerors with a direct economic interest in the procurement. AR Tab 123 at 7137.

■ The second standing requirement is that the protestor must show that the alleged errors in the procurement were prejudicial. *See Labatt Food Serv., Inc. v. United States,* 577 F.3d 1375, 1378 (Fed.Cir.2009) ("It is basic that because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.") (internal quotation

---

8. J & J's August 30, 2012 Complaint–In–Intervention also alleges that the Army violated FAR 15.306(d)(3), 48 C.F.R. § 15.306(d)(3), because the Army's discussions with J & J: were not meaningful; failed to evaluate J & J's bid properly; relied on incorrect information; deviated

from the Solicitation's stated evaluation criteria; and improperly awarded one or more MATOC Contracts to offerors whose proposals contained deficiencies or were outside the competitive range. Compl.–Int. ¶¶ 50–101.

marks omitted); *see also Myers Investigative & Sec. Servs., Inc.,* 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing."). Prejudice is demonstrated where a protestor "can show that but for the error, it would have had a substantial chance of securing the contract." *Labatt Food Serv., Inc.,* 577 F.3d at 1378. Importantly, the standing inquiry must not conflate the requirements of "direct economic interest" with prejudicial error. *Id.* at 1380 (explaining that examining economic interest but excluding prejudicial error from the standing inquiry "would create a rule that, to an unsuccessful but economically interested offeror in a bid protest, any error is harmful").

█ In this case, the court has determined that Linc and J & J were the only two unsuccessful offerors that submitted Phase II proposals and both allege that, if the Army had not violated procurement regulations, they would have been awarded MA-TOC Contracts. AR Tab 128 (Source Selection Authority Decision Document awarding contracts to the other five offerors that reached Phase II); Compl. ¶¶ 56–61; Compl.-Int. ¶¶ 50–101.

Therefore, the court has determined that Linc and J & J have standing to contest the award of the MATOC Contracts awarded by the Army, pursuant to the September 23, 2010 Solicitation, as amended, and Global, URS, ITSI, and United have standing to defend the award of MATOC Contracts to each of these firms.

## C. Applicable Standard Of Review.

Pursuant to the Tucker Act, as amended by the Administrative Dispute Resolution Act, Pub.L. No. 104–320, § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996), the United States Court of Federal Claims is authorized to review challenges to agency decisions, pursuant to the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) ("The reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"); *Banknote Corp. of Am., Inc. v. United States,* 365 F.3d 1345, 1350 (Fed.Cir. 2004) ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (citations omitted); *Weeks Marine, Inc. v. United States,* 575 F.3d 1352, 1358 (Fed.Cir.2009) (same).

█ When a bid protest is based on a regulatory or procedural violation, *i.e.,* "not in accordance with law," our appellate court also has imposed an additional requirement that "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Axiom Res. Mgmt., Inc. v. United States,* 564 F.3d 1374, 1381 (Fed.Cir.2009) (internal quotations and citations omitted). This burden is even greater when the procurement is a "best value" procurement, as is the case here. *See Galen Med. Assoc. Inc.,* 369 F.3d at 1330 ("[A]s the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion.... [T]he relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted); *see also Unisys Corp. v. Widnall,* 98 F.3d 1325, 1327 (Fed.Cir.1996) ("In determining whether the agency has complied with the regulation authorizing best value procurements, the [reviewing authority] may overturn an agency's decision if it is not grounded in reason.").

█ If an award decision is challenged, because it was made without a rational basis, the trial court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, so that the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Centech Group, Inc. v. United States,* 554 F.3d 1029, 1037 (Fed.Cir.2009); *see also Savantage Fin. Servs. Inc. v. United States,* 595

F.3d 1282, 1287 (Fed.Cir.2010) ("We must sustain an agency action unless the action does not evince rational reasoning and consideration of relevant factors.") (internal alterations, quotations and citations omitted); *Weeks Marine*, 575 F.3d at 1368–69 ("We have stated that procurement decisions invoke[ ] highly deferential rational basis review.... Under that standard, we sustain an agency action evincing rational reasoning and consideration of relevant factors.") (internal quotations and citations omitted).

 In the alternative, if an award decision is challenged on the grounds that an agency has acted in an arbitrary or capricious manner, the court may intervene "only in extremely limited circumstances." *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1372 (Fed.Cir.1983). "Courts have found an agency's decision to be arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.' " *Ala. Aircraft Indus. Inc.–Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed.Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)); *see also John C. Grimberg Co.*, 702 F.2d at 1372 (holding that the court may set aside agency action "only in extremely limited circumstances").

 In this case, the parties have filed Motions and Cross–Motions For Judgment On The Administrative Record, pursuant to RCFC 52. 1, requiring the court to conduct a proceeding akin to an expedited trial on the record. *See* RCFC 52.1, Rules Committee Note (July 13, 2009); *see also Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed.

Cir.2005) ("[T]he judgment on an administrative record is properly understood as intending to provide for an expedited trial on the record."). The existence of a material issue of fact, however, does not prohibit the court from granting a motion for judgment on the administrative record, although the court has not conducted an evidentiary proceeding. *Id.* at 1357 (instructing the court to make "factual findings under RCFC [52.1] from the [limited] record evidence as if it were conducting a trial on the record").

**D. Issues Raised By Plaintiff's Motion For Judgment On The Administrative Record.**

**1. The Army's Price Realism Analysis.**

**a. The Plaintiff's Argument.**

Linc argues that, by adding [redacted] to [redacted]'s price, the Army violated FAR 15.404–1(d)(3), stating that "results of the price analysis 'may be used in performance risk assessments and responsibility determinations,' but 'the offered prices shall not be adjusted as a result of the analysis[.]' " Pl. Mot. JAR at 28–29 (quoting FAR 15.404–1(d)(3) [9] and citing AR Tab 116 at 6882 (listing [redacted]'s [redacted] price) and AR Tab 123 at 7179 (listing [redacted]'s [redacted] price, as adjusted)). Instead of adjusting [redacted]'s price, the Army should have rejected [redacted]'s proposal, because [redacted]'s price was below the price realism threshold set forth in the Solicitation. Pl. Mot. JAR at 28–29 (citing AR Tab 123 at 7179, 7181 (setting a price realism range of plus or minus [redacted] of the Independent Government Estimate ("IGE") and showing that, even after the Army's adjustment, [redacted]'s price was [redacted] below the IGE)). As a result, the Army evaluated [redacted]'s proposal, based on an adjusted price that "appears nowhere in the awardee's

---

**9.** Linc's brief misquotes FAR 15.404–1(d)(3) by inserting the word "price" before "analysis." FAR 15.404–1(d)(3) provides:

Cost realism analyses may also be used on competitive fixed-price incentive contracts or, in exceptional cases, on other competitive fixed-price-type contracts when new requirements may not be fully understood by competing offerors, there are quality concerns, or past

experience indicates that contractors proposed costs have resulted in quality or service shortfalls. Results of the analysis may be used in performance risk assessments and responsibility determinations. However, proposals shall be evaluated using the criteria in the solicitation, and *the offered prices shall not be adjusted as a result of the analysis*.

48 C.F.R. § 15.404–1(d)(3) (emphasis added).

pricing proposal." Pl. Mot. JAR at 28 (citing AR Tab 123 at 7178–79). The Army's failure to follow the Solicitation prejudiced Linc. If the Army had rejected [redacted]'s price proposal, as it was required to do, the Army would have awarded a MATOC Contract to Linc. Pl. Mot. JAR at 29.

### b. The Government's Response.

The Solicitation states that "[o]ffers found to be unreasonably high or unrealistically low may be considered unacceptable and may be rejected on that basis." AR Tab 83 at 5139. Therefore, the Government argues that the Army properly exercised its discretion in "recommend[ing] cost realism analysis for competitive fixed-price contracts in exceptional cases[.]" Gov't Resp. to Pl. at 29 (citing FAR § 15.404–1(d)(3)). "[N]othing in the [Solicitation] required the Army to reject [redacted]['s] ... proposal as unrealistically low simply because [redacted]['s] ... proposed price was [redacted] below the Independent Government Estimate (IGE)." Gov't Resp. to Pl. at 9. The Government contends that the Army rationally considered, not only the difference between [redacted]'s price and the IGE, but also the reasons for that difference. Gov't Resp. to Pl. at 30. The low general and administrative overhead and low profit margin in [redacted]'s proposal did not "indicate performance risk or a lack of understanding of the work, but likely indicate[d] a conscious business decision ... to provide continued employment to its workforce during the recession, or for other business reasons." Gov't Resp. to Pl. at 30 (quoting AR Tab 123 at 7178–79 (SSEB Final Report)).

Although the Government concedes that there is a difference between the price in [redacted]'s proposal and the price on which the Army based its award to [redacted], that difference did not prejudice Linc. Gov't Resp. to Pl. at 31–32. The Army stated that it "corrected [[redacted]'s proposal price] to include [[redacted]'s] liability and builders risk insurance which was omitted." AR Tab 123 at 7179. The Government notes that [redacted]'s price "did include [redacted] for both insurance policies." Gov't Resp. to Pl. at 32 (citing AR Tab 89 at 5692, AR Tab 116 at 6862). Nonetheless, the bottom line is that an error representing 0.2% of [redacted]'s price did not affect the SSEB's cost realism analysis. Gov't Resp. to Pl. at 32.[10]

### c. The Court's Resolution.

■ The Solicitation's use of the modal verb "may" in the phrases "may be considered unacceptable" and "may be rejected" indicates that the Army retained the ability not to reject proposals containing unrealistic prices. *See Ace Constructors, Inc. v. United States,* 499 F.3d 1357, 1362 (Fed.Cir.2007) (affirming a trial court's decision that the use of "may," instead of "shall," rendered a contract provision permissive). Therefore, the Army did not act contrary to the Solicitation when it awarded a MATOC Contract to [redacted], despite the fact that [redacted]'s proposal did not conform to the price realism range. AR Tab 83 at 5139 ("Offers found to be unreasonably high or unrealistically low may be considered unacceptable and may be rejected on that basis.").

■ There is no question that the Army's unilateral adjustment of [redacted]'s price by [redacted], *i.e.,* 0.2%, violated FAR 15.404–1(d)(3). But, the Administrative Record does not evidence that the Army otherwise would have rejected [redacted]'s proposal, as the Army's cost realism analysis focused on the reasons for [redacted]'s low price, instead of the difference between [redacted]'s price and the IGE (AR Tab 123 at 7178–79 (SSEB Final Revised Report)). The 0.2% price adjustment made by the Army, although unlawful, did not materially affect the decision to award [redacted] a contract and, therefore, did not prejudice Linc or J & J.

As to the related issue of non-price ratings, the Army was required to downgrade those ratings, but only if the Army deemed the price proposal unrealistic. AR Tab 3 at 189. The Army concluded that [redacted]'s price was not unrealistic, but "indicate[d] a conscious business decision ... to provide continued employment to its workforce during

---

10. [redacted] adopted and concurred in the Government's argument. [redacted] Resp. to Pl. at 1–2.

the recession, or for other business reasons." AR Tab 123 at 7178–79 (SSEB Final Revised Report). Therefore, the Army concluded that no adjustment to [redacted]'s non-price ratings was required.

For these reasons, the court has determined that the Army violated FAR 15.404–1(d)(3), but that violation was not prejudicial. *See Labatt Food Serv., Inc.*, 577 F.3d at 1380 (denying a bid protest where the plaintiff failed to show that the agency's error was prejudicial).

## 2. The Army's Assessment Of The Risk Mitigation Plan.

### a. The Plaintiff's Argument.

FAR 1.102(b)(3) [11] and FAR 15.306(e)(1) [12] prohibit the Army from affording any offeror an opportunity to improve its proposal, without providing the same opportunity to other offerors. Pl. Mot. JAR at 29–30. Linc argues that the Army did not advise it of any concerns as to its Risk Management Plan, but advised [redacted] and [redacted] that their Risk Management Plans lacked site specificity. Pl. Mot. JAR at 30 (citing AR Tab 107 at 6757; AR Tab 110 at 6772; AR Tab 111 at 6776). Thereafter, [redacted] and [redacted] modified their proposals and achieved higher ratings than Linc. Pl. Mot. JAR at 30–31. As a matter of law, however, the Army was obligated to discuss every weakness that would have "a significant impact on the protester's proposal technical rating," even if those weaknesses were not designated as deficiencies nor result in the proposal being considered as unacceptable. Pl. Mot. JAR at 31–32 (citing *Alliant Techsystems, Inc.*, B–260215.5, 1995 WL 502664 (Comp.Gen. Aug. 4, 1995) (A procuring agency is required to discuss a weakness that has a significant impact on the protester's proposal technical rating, even though the weak-

nesses are not labeled deficiencies and did not result in the protester's proposal being considered unacceptable); *see also Lockheed Martin Simulation, Training and Support*, B–292836.8, 2004 WL 3217797 (Comp.Gen. Nov. 24, 2004) (stating that weaknesses may be required as part of meaningful discussions, even when not identified as such in a technical evaluation report)); *see also* Pl. Reply at 24–25 (citing 2 Steven W. Feldman, *Government Contract Awards: Negotiation and Sealed Bidding* § 16:14 (2011) (proposal of an Army counsel regarding the proper standard for discussions, concluding that a "fail[ure] to conduct meaningful discussions" occurs when "[a]n improvement in the proposal area that was not discussed could reasonably have led to the protestor's selection for award")). Therefore, Linc insists that "the proper standard for discussions here is that the [Army] should have informed Linc of anything that put [Linc] at risk of not receiving award[.]" Pl. Reply at 24–25.

### b. The Government's Response.

The Government responds that the Army was "not required to discuss every area where proposals could be improved." Gov't Resp. to Pl. at 25–26 (quoting FAR 15.306(d)(3)). [13] Discussions are meaningful only when they "generally lead offerors into the areas of their proposals requiring amplification or correction[.]" *Advanced Data Concepts, Inc. v. United States*, 43 Fed.Cl. 410, 422 (1999), *aff'd*, 216 F.3d 1054 (Fed.Cir. 2000). Because Linc's Risk Management Plan was acceptable, the Army "had no need or reason to hold discussions [with Linc] about site specificity." Gov't Resp. to Pl. at 28.

### c. The Court's Resolution.

■ Although Linc asserts that the Army was "comparatively silent" about Linc's Risk

---

11. FAR 1.102(b)(3) provides:

(b) The Federal Acquisition System will—
. . .
(3) Conduct business with integrity, fairness, and openness;
48 C.F.R. § 1.102(b)(3).

12. FAR 15.306(e)(1) states:

(e) Limits on exchanges. Government personnel involved in the acquisition shall not engage in conduct that—

(1) Favors one offeror over another;
48 C.F.R. § 15.306(e)(1).

13. FAR 15.306(d)(3) requires that the procuring agency discuss "deficiencies, significant weaknesses, and adverse past performance information," but "encourag[es]" the contracting officer "to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award." 48 C.F.R. § 15.306(d)(3).

Management Plan (Pl. Mot. JAR at 31), the Administrative Record reflects that the Army provided Linc with more feedback reflecting this factor than [redacted] or [redacted]. *Compare* AR Tab 107 at 6757 (devoting more than half a page discussing three deficiencies, one significant weakness, and one weakness in Linc's Risk Management Plan proposal), *with* AR Tab 110 at 6772 (devoting a third of a page discussing one deficiency and two weaknesses in [redacted]'s proposal), and AR Tab 111 at 6776 (devoting a third of a page discussing one deficiency and two weaknesses in [redacted]'s proposal). It is true that the Army suggested that [redacted] and [redacted] present their proposals in a less generic and more site-specific manner (AR Tab 110 at 6772, AR Tab 111 at 6776), as well as Linc. AR Tab 107 at 6757 ("Essentially the offeror has parroted the [Statement of Work] and specific salient features are lacking."). As such, the Army's discussions enabled *Linc to improve its Risk Management Plan* from "[redacted]" to "[redacted]." AR Tab 123 at 7171 (evidencing that Linc addressed the issues raised by the Army). Linc, however, conflates what FAR 15.306(d)(3) requires with what it encourages, so that the court declines Linc's invitation to construe FAR 15.306(d)(3) to require that the Army inform an offeror of "anything that put it at risk of not receiving award." Pl. Reply at 24.

For these reasons, the court has determined that the Army did not violate FAR 1.102(b)(3), FAR 15.306(d)(3), or FAR 15.306(e)(1), or act in an arbitrary manner in evaluating Linc's Risk Assessment Plan.

### 3. The Army's Evaluation Of Proposed "Betterments."

#### a. The Plaintiff's Argument.

Linc also argues that the Army failed to adhere to the Solicitation, as amended, when it did not conduct an overall ranking or technical rating for each proposal. Pl. Mot. JAR

at 32 (citing AR Tab 83 at 5131 (Solicitation terms requiring that the Army base awards by a comparison of proposals to determine which represent the "best value," based on the evaluated ratings); AR Tab 145 at 7706–07 (post-award debriefing of Linc)). The Army compounded this error by: "(1) fail[ing] to properly read, let alone evaluate, the entirety of Linc's proposal; or (2) treat[ing] Linc disparately." Pl. Mot. JAR at 33. Specifically, the Army failed to credit Linc with twenty-three "betterments" as to technical Factors 1 and 3. Pl. Mot. JAR at 34 (reciting the twenty-three "betterments"); Pl. Reply at 11–16 (citing the twenty-three "ignored betterments" in a chart).[14]

In sum, at least 9 of those 23 "ignored" betterments "were credited as strengths/significant strengths by the [Army] in its evaluation of the awardees," but not in the Army's evaluation of Linc's proposals. Pl. Mot. JAR at 34. Consequently, Linc argues that it should have received a rating equal to or better than [redacted] and [redacted], because Linc's proposal was technically as good as or better than theirs and Linc's price was lower. Pl. Mot. JAR at 35 ("Linc had all of the same strengths as [redacted], as well as additional strengths.... Likewise, Linc had most of the same strengths as [redacted], as well as additional strengths."). Linc insists that it should have received ratings of "[redacted]" as to Factors 1 and 3 and that, if it had, the Army would have awarded Linc a MATOC Contract as "technically superior to [redacted][,]" "technically superior to [redacted]," and "technically equal and lower in price than [redacted][.]" Pl. Mot. JAR at 35–36. Consequently, the Army's "disparate treatment of Linc ... is an independently sustainable protest ground." Pl. Mot. JAR at 36 (citing *Chenega Mgmt., Inc. v. United States*, 96 Fed.Cl. 556, 585 (2010) (holding that disparate treatment violates FAR 1.602–2(b)'s requirement that "contractors receive

---

14. The discussion in the first half of Linc's September 19, 2012 Motion For Judgment On The Administrative Record describes some, but not all of the twenty-three "betterments" that the Army failed to recognize or credit regarding Linc's proposal. Pl. Mot. JAR 6–9, 18–20. Linc describes six "betterments" under both element

1 and element 2 of Factor 1. Pl. Mot. JAR at 6–9 (repeating items 1, 2, 4, 5, 6, and 11 under element 1 as items 1–3, 5, 6, and 9 under element 2). But, some of those elements also appear under Factor 3. Pl. Mot. JAR at 18 (listing three repeated items among the four contended "betterments," under element 1 of Factor 3).

impartial, fair, and equitable treatment")).[15]

### b. The Government's Response.

The Government responds that "the alleged betterments [Linc] cited merely met the criteria of the [S]olicitation and [do] not constitute betterments as defined by the [S]olicitation." Gov't Resp. to Pl. at 15 (citing AR Tab 3 at 251 (defining "betterments" as "[a]ny portions of the accepted proposal which both conform to and exceed the provisions of the [S]olicitation")). The Government concedes that "Linc correctly identifies a limited number of errors in the [Source Selection Evaluation Board's] report and evaluation," but these errors "did not significantly affect each offeror's ratings." Gov't Resp. to Pl. at 23. The Government discusses three such errors. Gov't Resp. to Pl. at 23–24. First, the Army described the Small Business Participation Plans of [redacted], [redacted], [redacted], and [redacted] as [redacted], but gave no similar recognition to Linc. Gov't Resp. to Pl. at 23. This error, however, did not prejudice Linc, because even if the Army recognized Linc's Small Business Plan as a [redacted] that alone would not have improved Linc's rating as to Factor 1. Gov't Resp. to Pl. at 23. Second, the Army credited [redacted] for the use of federally mandated low flow toilets. Gov't Resp. to Pl. at 24. This error, however, did not prejudice Linc, because "[t]he toilet item represented one of dozens of evaluation data points in the procurement and had a negligible impact on the selection of awardees." Gov't Resp. to Pl. at 24. Third, the Army's rating for Factor 1 erred in referring to weaknesses in [redacted] and [redacted]'s proposals, although [redacted] and [redacted] had amended their proposals to remove those weaknesses. Gov't Resp. to Pl. at 24–25.[16]

The Government further explains that, where the Administrative Record is silent with respect to the Army's evaluation of Linc's alleged "betterments," that lack of documentation should be construed in the Army's favor. Gov't Reply to Pl. at 4

("[W]here record evidence does not conflict with the decision made, '[c]ontracting officers are not obligated by the APA to provide written explanations for their actions.' ") (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1337 (Fed.Cir.2001)). In the alternative, if the Army's silence about Linc's alleged "betterments" frustrates judicial review of the Army's contracting decision, the appropriate remedy is a remand to the Army, rather than setting aside the procurement. Gov't Reply to Pl. at 6 n. 1.

### c. The Court's Resolution.

The United States Court of Appeals for the Federal Circuit has held that "the minutiae of the procurement process in such matters as technical ratings ... involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed.Cir.1996). The court further has been instructed that its role is not to ascertain whether a proposed "betterment" is a "strength" or a "significant strength" or whether the Army's evaluation was correct. *Id.* Instead, the court's review is limited to whether the Army evaluated competitive proposals in an inconsistent manner or otherwise acted arbitrarily or capriciously. *Id.;* see also *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085 (Fed.Cir. 2001) (stating that an agency's "action must be upheld as long as a rational basis is articulated and relevant factors are considered"). Although the Government cites *Impresa Construzioni* for the proposition that a contracting officer need not provide a written explanation for its decision, that case also holds that "even if the agency is not obligated to provide reasons, a court may nonetheless order the agency to provide [an] explanation if such an explanation is required for meaningful judicial review." *Impresa Construzioni*, 238 F.3d at 1338.

---

**15.** FAR 1.602–2(b) provides:
 Contracting officers shall—
 . . .
 (b) Ensure that contractors receive impartial, fair, and equitable treatment[.]
 48 C.F.R. § 1.602–2(b).

**16.** The clerical errors identified did not affect the ratings or were too minor to warrant setting aside the MATOC Contract awards. Gov't Mot. JAR at 25.

In this case, the Solicitation defined a "betterment" as "portions of the accepted proposal which both conform to and exceed the provisions of the [S]olicitation." AR Tab 3 at 251. In addition, the Solicitation required that the Army recognize as a "betterment" an "offer [that provides] additional value to the [Army]." AR Tab 83 at 5131.

Therefore, the court examines the Administrative Record to ascertain whether the Army, in fact, considered the proposed "betterments" in Linc's proposal, pursuant to this standard.[17]

### i. Smoke Detectors.

■■■ First, Linc's proposal included removing existing smoke detectors, because the new sprinkler system, rendering them unnecessary and this action would "reduce future maintenance costs." AR Tab 100 at 6408. Although the Government argues that "the mere removal of a potentially redundant system does not by itself increase the chances for 'success' performing the contract or add value to the contract" (Gov't Resp. to Pl. at 15–16), if Linc's proposal would reduce future maintenance costs, while also meeting the Solicitation's requirements, it would meet the definition of a "betterment." The Army's evaluation of Linc's proposal, however, evidenced *no analysis* of Linc's proposal regarding smoke detectors or any consideration of Linc's proposed cost savings.

For these reasons, the court has determined that the Administrative Record does not show whether the Army evaluated Linc's proposal to remove smoke detectors or how it decided that Linc's proposal was not a "betterment." Therefore, the Army's evaluation of this factor was not rational. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. 2856 (requiring an agency to " examine the relevant data and articulate a satisfactory explanation for its action including a

'rational connection between the facts found and the choice made' ").

### ii. Special Method For Installing Insulation.

■■■ Second, Linc's proposal included a method for installing insulation to protect the sprinkler system and "get the insulation batting off new suspended ceiling tiles and in effect reduce maintenance." AR Tab 100 at 6409. The Government conceded this was a "betterment," but explained that the Army failed to notice it, because Linc's disclosure of this "betterment" was discussed in the wrong section of its proposal. Gov't Resp. to Pl. at 16 (citing AR Tab 123 at 7171). Linc countered that "the page of the proposal highlighted in the [Army's] initial evaluation for this betterment did not change with Linc's [final proposal revision]." Pl. Reply at 6 (citing AR Tab 100 at 6409).[18] The Government cites *IBM Corp. v. United States*, 101 Fed.Cl. 746, 759 (2011) for the proposition "that the agency is not required to search [the] entire proposal for additional information to assist the proposer[.]" Gov't Resp. to Pl. at 16. But that overstates the ruling in *IBM Corp.*, where the court found that the plaintiff put important information in a volume that "the Solicitation did not indicate would be evaluated for purposes of an award of a contract[.]" *Id.* at 758.

For these reasons, the court has determined that the Army's evaluation of Linc's insulation installation was arbitrary. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. 2856.

### iii. Floor And Wall Covering Finishes.

■■■ Third, Linc's proposal included floor and wall covering finishes that were not required by the Solicitation. AR Tab 157 at 7924–25. The Government argues that the finishes were only cosmetic, and provided no

---

17. Although Linc lists 23 ignored betterments, the court has combined its evaluation of four of those betterments under a single heading and thus shortened the list of betterments to 20. Specifically, the court evaluates Linc's assertions regarding the experience of its project manager, project superintendent, site quality control manager, and site safety health officer as if they were a single assertion about "Experienced Personnel."

18. Apparently, the Army did not treat [redacted] in a similar manner, since the Army afforded [redacted] a "significant strength" under Factor 1 and a "betterment" under Factor 3. Pl. Reply at 6–7 (citing AR Tab 123 at 7149 (crediting [redacted]'s fast-track plan under Factor 1)); *see also* AR Tab 88 at 5585 (showing that [redacted] in fact described the fast-track plan under Factor 3 in its proposal).

added value for the Army. Gov't Resp. to Pl. at 16. But, the Government points to nothing in the Administrative Record, nor did the court identify any document that evidences that the Army even considered this proposed "betterment" in its evaluation of Linc's proposal.

For these reasons, the court has determined that the Army's apparent decision not to consider Linc's proposal regarding floor and wall covering finishes as a "betterment" did not have a rational basis. *See Impresa Construzioni*, 238 F.3d at 1332.

#### iv. Experienced Personnel.

■ Fourth, Linc's proposal proposed key personnel with experience that exceeded the Solicitation's minimum requirements. Pl. Reply at 12–13 (citing AR Tab 100 at 6434–45). The Army credited Linc's Project Superintendent's experience as a strength, but apparently took no notice of the qualifications of other key Linc personnel. AR Tab 123 at 7173. The Government attempted to justify the Army's decision citing the brevity of the other personnel's résumés, as compared with the Project Superintendent's résumé. Gov't Resp. to Pl. at 16.

For these reasons, the court has determined that the Army's evaluation of Linc's key personnel résumés on the basis of length was arbitrary. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. 2856 (holding that a decision is arbitrary when it is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise").

#### v. Fire Sprinkler System Flow Test.

Fifth, Linc's proposal included conducting a flow test of the fire sprinkler system at the site investigation stage. AR Tab 100 at 6405. Amendment 0005 to the Solicitation, however, did not mention the fire sprinkler system by name, but simply required a site investigation that would create an "understanding of the existing conditions, required Repair/Renewal work, specific impacts and risks associated with the work, risk resolution, and the level of effort required to develop the Work Plan." AR Tab 79 at 5036–37.

For these reasons, the court has determined that the lack of specificity and the ambiguity in the Solicitation makes it impossible for the court to determine whether the Army acted in an arbitrary manner in concluding that the timing of Linc's flow test was not a "betterment."

#### vi. Early Involvement Of Specialty Subcontractors.

■ Sixth, Linc's proposal included the early use of specialty subcontractors to afford Linc special expertise in the design phase of the project." AR Tab 157 at 7929. The Government argues that this was not a "betterment," because "none of the . . . awardees proposed waiting to involve specialty subcontractors." Gov't Mot. JAR at 17 (citing AR Tab 89 at 5651 ( [redacted]'s proposal) and AR Tab 91 at 5794 ( [redacted]'s proposal)). But, the examples that the Government cites indicate that the early involvement of subcontractors was not universal nor without value. AR Tab 89 at 5651 ( [redacted]'s proposal); AR Tab 91 at 5794 ( [redacted]'s proposal). For example, [redacted] proposed using [redacted] to allow [redacted] to involve subcontractors "at task order award so they can participate in the site investigation and work plan phases." AR Tab 91 at 5794. [redacted] also touted its ability to make "immediate decisions" to involve subcontractors at critical early stages of the project, because it [redacted]. AR Tab 89 at 5651. Therefore, the Administrative Record shows that [redacted] and [redacted] shared Linc's belief that expeditious subcontractor involvement was a "betterment." The Administrative Record, however, does not evidence whether the Army even considered the early involvement of contractors or discounted these proposals as nothing more than the industry norm.

For these reasons, the court has determined that the Army's apparent decision not to consider Linc's proposal to provide early specialty subcontractor involvement did not have a rational basis. *See Impresa Construzioni*, 238 F.3d at 1332.

#### vii. Safety Meetings.

■ Seventh, Linc's proposal included monthly on-site safety meetings. AR Tab 100 at 6403. The Solicitation required such safety meetings. AR Tab 83 at 5133 (incor-

porating the Division One specifications for the initial task order); AR Tab 94 at 6137 (incorporating Engineer Manual 385–1–1 in the Division One specifications); Gov't Resp. to Pl. App. at 12 (Engineer Manual 385–1–1 § 01.B.05 (2003)).[19] *Proposing meetings required by the Solicitation does not constitute a "betterment."*

For these reasons, the Army's decision not to consider monthly on-site safety meetings was not arbitrary.

### viii. ISO Certification.

■ Eighth, Linc's proposal states that Linc was ISO certified, but did not explain how that fact would provide additional value to the Army. AR Tab 100 at 6403. Therefore, Linc failed to satisfy the Solicitation's requirement to show how ISO certification provided the Army with added value. AR Tab 83 at 5131.

For these reasons, the court has determined that the Army's decision not to consider Linc's ISO certification as a "betterment" was not arbitrary.

### ix. Systems Testing.

■ Ninth, Linc's proposal identified the systems that it would test. AR Tab 100 at 6404–05. The Solicitation, however, afforded the Army with broad discretion to determine what type of testing constituted a "betterment." AR Tab 83 at 5134 (requiring systems testing); AR Tab 94 at 6208–09 (requiring the contractor to perform "applicable field tests" and providing a list of example items).

For these reasons, the court has determined that the Army's decision not to consider identification of the systems that Linc would test as a "betterment" was not arbitrary.

### x. Training.

■ Tenth, Linc's proposal included both classroom and hands-on training. AR Tab 100 at 6405. The Solicitation, however, called for training with "both a classroom phase and a practical application phase." AR Tab 94 at 6209. Therefore, Linc's training proposal met the requirements of the Solicitation, but was not a "betterment."

For these reasons, the court has determined that the Army's decision not to consider Linc's training proposal as a "betterment" was not arbitrary.

### xi. Close–Out Documentation.

■ Eleventh, Linc's proposal stated that close-out documentation would "occur throughout the length of the task order" (AR Tab 100 at 6406), but a diagram in the proposal showed closeout occurring near the end of the task order. AR Tab 100 at 6432. Assuming that the text is more accurate than the diagram, any value to the Army for this "betterment" is far from clear in Linc's proposal. *Compare* Pl. Mot. JAR at 8 (representing that an early start on close-out would avoid end-of-project lag time caused by waiting for documentation) *with* AR Tab 100 at 6406 (no explanation of any added value to the Army).

For these reasons, the court has determined that the Army's decision not to credit Linc with a "betterment" for close-out documentation was not arbitrary.[20]

### xii. Risk Management Plan.

■ Twelfth, Linc's proposal included solutions to eight additional risk items and listed two as "value added item[s]." AR Tab 100 at 6408–09. The Solicitation required that all proposals provide "site and project specific" risks and mitigations. AR Tab 83 at 5134. Again, [redacted] was credited with a strength for including "detailed site specific

---

**19.** On October 5, 2012, Linc moved to strike the Appendix to the Government's September 28, 2012 Response And Cross Motion For Judgment On The Administrative Record. The court has decided to deny Linc's Motion, since the Appendix consisted of the Engineer Manual, that was incorporated by reference in the Solicitation, and therefore, properly should be considered part of the Administrative Record. *See Axiom Res. Mgmt., Inc.,* 564 F.3d at 1380 (holding that the

Administrative Record consists of "the record actually before the agency.").

**20.** Linc's proposal was not the only one that suggested an early start on close-out. AR Tab [redacted] at [redacted] ([redacted]'s proposal) ("From an onsite perspective, the superintendent begins work on project closeout almost immediately."). And, [redacted] also was not credited with a "betterment." AR Tab 123 at [redacted].

risks and mitigations ... demonstrat[ing] a thorough understanding of potential issues," but Linc was not. *Compare* AR Tab 123 at [redacted] (evaluation of [redacted]) *with* AR Tab 123 at 7171 (evaluation of Linc) *and* AR Tab 145 at 7703 (debriefing of Linc). The Administrative Record, however, evidences that [redacted] identified more and different risks than Linc did. AR Tab [redacted] at [redacted] (describing thirteen risks and solutions).

For these reasons, the court has determined that the Army did not act in an arbitrary manner when it credited [redacted], but not Linc, with a strength for its Risk Management Plan.

### xiii. Low–Flow Toilets.

■ Thirteenth, Linc's proposal included replacing toilets with low flow fixtures. AR Tab 157 at 7927 (Linc). The Army credited [redacted] and [redacted] with a "betterment," as to this item, but not Linc. *Compare* AR Tab 123 at [redacted] ([redacted]), *and* AR Tab 123 at [redacted] ([redacted]), *with* AR Tab 123 at 7171 (Linc). [redacted] asserts that the Army's assessment was justified, because [redacted]'s proposal required the replacement of all fixtures, but Linc's proposal offered only to replace the minimum number of fixtures specified in the Solicitation. [redacted] Resp. to Pl. at 9; *see also* Pl. Reply at 22 (Linc responded that it proposed replacements to "what the site condition showed was needed" and [redacted] "ignore[d] the agency's needs or wants"). The SSEB Report observed that "[[redacted]] proposes low flow fixtures and toilets as a betterment which will reduce water consumption," but this same evaluation should have been made as to Linc's proposal. AR Tab 123 at 7139 (SSEB Report consensus evaluation of [redacted]). The Government argues, however, that, in fact, none of the offerors' low flow fixture plans should be considered as a "betterment," because the fixtures were required by 42 U.S.C. § 6295(k)(1). Gov't Resp. to Pl. at 24.

For these reasons, the court has determined that, whether Linc or the Government

is correct, the Army's decision to credit [redacted] and [redacted] with a "betterment" for replacing toilets with low flow fixtures, was arbitrary. *See Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. 2856.

### xiv. Fast Track Plan.

■ Fourteenth, Linc argues that some of the proposal discussed above regarding: specialty subcontractors; early close-out; and testing during Site Investigation—collectively should be recognized as a "fast track" initiation "betterment." Pl. Mot. JAR at 12, 34; Pl. Reply at 15. The Government counters that, although Linc's proposed completion time of twelve months "fell within the reasonable and realistic range," it was slower than [redacted]'s proposed [redacted] months and [redacted]'s proposed [redacted] months. Gov't Resp. to Pl. at 19 (citing AR Tab 100 at 6432 (Linc); AR Tab [redacted] at [redacted] ([redacted]); AR Tab [redacted] at [redacted] ([redacted])). The Administrative Record reflects that the "fast track betterments" that were credited as strengths qualitatively were different than the schedule that Linc proposed. *Compare* AR Tab [redacted] at [redacted] ([redacted]'s Fast Tracking plan), AR Tab [redacted] at [redacted] ([redacted]'s Construction Sequencing), *and* AR Tab [redacted] at [redacted] ([redacted]'s fast track approach), *with* AR Tab 100 at 6388–6514 (Linc's proposal).

For these reasons, the court has determined that the Army's decision not to consider Linc's fast track plan as a "betterment" was not arbitrary.

### xv. Occupancy Sensors To Control Lighting.

■ Fifteenth, Linc proposal included occupancy sensors to control bathroom lighting and dual switching in conference and multipurpose rooms. AR Tab 157 at 7927. [redacted] proposed [redacted]. AR Tab 93 at 5908. The Army credited [redacted] with a "betterment," but not Linc. *Compare* AR Tab 123 [redacted] at ([redacted]), *with* AR Tab 123 at 7171 (Linc). The Solicitation, as modified, required the use of occupancy sensors in restrooms. AR Tab 164 at 7983–84.[21]

---

21. The Army explained that the requirements regarding occupancy sensors in the June 2012

Bid Inquiry Contracting Officers Report (AR Tab 164 at 7975–8007), was part of a Bidder Inquiry

Linc's proposed use of dual switching in conference and multipurpose rooms was a betterment that added value for the Army, but it did not add as much value as [redacted]'s proposal.

For these reasons, the court has determined that the Army's decision to treat [redacted]'s use of occupancy sensors as a "betterment," but not Linc's, was not arbitrary.

### xvi. Mold–Resistant Drywall.

■ Sixteenth, both the Linc and [redacted] proposals included using mold-resistant drywall. AR Tab 157 at 7294 (Linc); AR Tab [redacted] at [redacted] ( [redacted] ). But, the Army credited only [redacted] with a strength. *Compare* AR Tab 123 at 7171 (Linc), *with* AR Tab 123 at [redacted] ( [redacted] ). Linc stated it would use drywall "typically," whereas [redacted] did not include a modifier. AR Tab 157 at 7294 (Linc); AR Tab [redacted] at [redacted] ( [redacted] ). Therefore, the two proposals were not comparable.

For these reasons, the court has determined that the Army's decision to consider [redacted]'s use of mold-resistant drywall as a "betterment," but not Linc's, was not arbitrary.

### xvii. Additional Personnel.

■ Seventeenth, Linc's proposal included more personnel than the Solicitation required. AR Tab 100 at 6436–40. In particular, Linc asserts that its inclusion of an "Electrical Engineer Designer of Record, Architectural Designer of Record, Civil Engineer Designer of Record, and Mechanical/Plumbing Designer of Record ... ensure quality and timely completion of the subject project." Pl. Mot. JAR at 8. The Army did not credit Linc with a "betterment" for proposing personnel beyond those required to be listed under the Solicitation.

For these reasons, the court has determined that the Army's decision not to consider Linc's proposal as to additional personnel as a "betterment" was not arbitrary.

### xviii. Scheduling.

■ Eighteenth, Linc's proposal included a schedule so that complementary tasks would overlap. AR Tab 100 at 6432–33. But, Linc's proposed completion time was not significantly ahead of other offerors.

For these reasons, the court has determined that, the Army's decision not to consider Linc's proposed schedule as a "betterment" was not arbitrary.

### xix. Multipurpose Areas.

■ Nineteenth, Linc's proposal included multipurpose areas, such as a "break/conference room and ... classroom/training spaces." AR Tab 157 at 7922. The Army recognized [redacted]'s use of "[redacted]" as a "betterment," but not Linc's. *Compare* AR Tab 123 at [redacted] ( [redacted] ), *with* AR Tab 123 at 7171 (Linc). [redacted]'s [redacted] however, were distinct from Linc's proposal. *Compare* AR Tab [redacted] at [redacted] ( [redacted] ), *with* AR Tab 157 at 7922 (Linc).

For these reasons, the court has determined that the Army's decision not to consider Linc's proposed multipurpose areas as a "betterment" was not arbitrary.

### xx. Small–Business Participation.

■ Twentieth, although the Army credited Linc with a strength for "list[ing] numerous categories of small business they have done business with in the past and propose to use in the future and what type of work they can provide," Linc takes issue with the Army's decision to make "the exact same finding for this factor in the proposals of [[redacted], [redacted], [redacted], and [redacted],]" and credit them with *significant* strengths, but not Linc. Pl. Mot. JAR at 35. *Compare* AR Tab 123 at 7174 (Linc), *with* AR Tab 123 at [redacted] ( [redacted] ), [redacted] ( [redacted] ), [redacted] ( [redacted] ). Linc insists that it provided similar detail and a longer list of small businesses than the other offer-

System described in the Solicitation. AR Tab 3 at 140. The Government's September 6, 2012 *unopposed Motion For Leave To Correct And Supplement The Administrative Record* proposed including this Report, and other "documents considered by source selection officials during this procurement." 9/6/12 Gov't Mot. at 2. The Government's September 6, 2012 Motion is granted. *See Axiom Res. Mgmt., Inc.,* 564 F.3d at 1380 (holding that the Administrative Record consists of "the record actually before the agency").

ors. *Compare* AR Tab 157 at 7933–40 (Linc), *with* AR Tab [redacted] at [redacted] ([redacted]), AR Tab [redacted] at [redacted] ([redacted]) *and* AR Tab [redacted] at [redacted] ([redacted]). The Government, however, offered no explanation for the disparity in the Army's evaluations, and the Administrative Record evidences none.

For these reasons, the court has determined that the Army's apparent decision not to consider Linc's small-business participation element as a "betterment" did not have a rational basis. *See Impresa Construzioni*, 238 F.3d at 1332; Gov't Resp. to Pl. at 23 (discussing the disparity in a paragraph about the "limited number of errors in the SSEB's [R]eport and evaluation").

**E. Issues Raised By Plaintiff–Intervenor's Motion For Judgment On The Administrative Record.**

**1. The Army's Price Realism Analysis.**

**a. The Plaintiff–Intervenor's Argument.**

J & J argues that the Army acted arbitrarily and capriciously in conducting the price realism analysis of [redacted]'s and [redacted]'s proposals. Pl.–Int. Mot. JAR at 20–27. First, the Army failed to follow the terms of the Solicitation by not rejecting [redacted]'s proposal nor downgrading [redacted]'s non-price ratings. Pl.–Int. Mot. JAR at 7, 21 (citing AR Tab 3 at 189 ("If an offeror's price is deemed to be unrealistic . . . the Government will factor this consideration into the applicable non-price ratings.")). Second, [redacted]'s proposal was unrealistic, not only because [redacted]'s price was more than 15% below the IGE, but because [redacted] based its overhead costs on proximity to the initial task order site. Pl.–Int. Mot. JAR at 21 (citing AR Tab 123 at 7178–79 (listing [redacted]'s price as [redacted]% below the IGE) and AR Tab [redacted] at [redacted] (explaining that [redacted]'s overhead rate was based on "the seed project's close proximity location to [redacted]'s home office")). The Solicitation, however, specified that the overhead rate could not exceed the maximum rate for any task order issued under a MATOC Contract. Pl.–Int. Mot. JAR at 21 (citing AR Tab 79 at 5068 (stating that a proposal's overhead rate set a maxi-

mum) and AR Tab 3 at 116 (describing the locations of the projects)). [redacted]'s explanation for its low overhead did not meet the Solicitation's requirement, and the Army's failure to consider this was arbitrary. Pl.–Int. Mot. JAR at 21–22.

In addition, J & J asserts that the Army was incorrect in concluding that [redacted]'s price would have been within the acceptable price realism range of plus or minus 15% of the IGE, if [redacted] had used the IGE rates for profit and construction G & A overhead. Pl.–Int. Reply at 6 (citing AR Tab 103 at 6681–82). Therefore, the Army's calculation "(replacing the profit and (G & A/OH in [redacted]'s proposal with those rates in the IGE [increased] [redacted]'s total price . . . from $[redacted] to $[redacted], or from 26% to 22.4% below the IGE—[was] still well below the realism threshold of 15% IGE." Pl.-Int. Reply at 6 (citing AR Tab 103 at 6681–82 (explaining the Army's calculation) and AR Tab 103 at 6696–97 (displaying the data)). Therefore, the Administrative Record evidence that the Army's price realism analysis was based on a "critical miscalculation" or "irrational assumption" and therefore "lacks a rational basis." Pl.–Int. Reply at 6–7.

J & J also argues that the Army conducted a flawed price realism analysis as to [redacted], because the Army used different techniques than it did with [redacted]'s proposal. Pl.–Int. Mot. JAR at 23. Specifically, the Army's price realism analysis of [redacted]'s proposal was based on [redacted]'s price, without G & A and overhead; in contrast, the price realism analysis of [redacted]'s proposal was based on [redacted]'s total price. Pl.–Int. Mot. JAR at 23 (citing AR Tab 123 at [redacted] (analyzing [redacted]'s proposal) and AR Tab 123 at [redacted] (rating [redacted]'s total price as "reasonable and realistic in comparison to the IGE")). J & J asserts that the Army should have analyzed [redacted]'s Total Cost to Prime, *i.e.*, cost without taxes, construction G & A, construction overhead, bond, and profit. Pl.–Int. Mot. JAR at 23 (stating that [redacted]'s Total Cost to Prime is [redacted]% below the IGE (citing AR Tab 123 at 7188)). Since [redacted]'s Total Cost to Prime was almost

[redacted] the Solicitation's 15% realism threshold, the Army's award of a MATOC Contract to [redacted], on its face, was arbitrary. Pl.–Int. Mot. JAR at 23.

**b. The Government's Response.**

The Government responds that the court should disregard J & J's criticism of the Army's calculations, because that issue was raised for the first time in J & J's Reply Brief. Gov't Reply to Pl.–Int. at 7 n.2 (citing *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed.Cir.2002) ("Raising the issue for the first time in a reply brief does not suffice; reply briefs *reply* to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration.")). Even if J & J had not waived that argument, J & J's argument was directed to the original SSEB Report, instead of the final one. Gov't Reply to Pl.–Int. at 6–7. With regard to J & J's assertions of the Army's evaluation of [redacted]'s proposal, nothing in the Solicitation required that the price realism analysis be based on Total Cost to Prime. Gov't Resp. to Pl.–Int. at 25 (citing AR Tab 83 at 5139). If J & J is arguing that the Solicitation should have contained such a requirement, J & J should have made that argument before submitting its proposal. Gov't Resp. to Pl.–Int. at 25 (citing *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1312 (Fed.Cir.2007) (holding that a protester waives the right to challenge the terms of a solicitation, if it fails to contest those terms before submitting a proposal)).

The Government, however, does not dispute that [redacted]'s [redacted] overhead rate reflected its [redacted]'s proximity to the seed project, nor that [redacted] would have to apply that same [redacted] overhead rate to task orders for work in other locations. Gov't Reply to Pl.–Int. at 3–4. But [redacted]'s explanation for its [redacted] overhead rate was not a material deviation from the Solicitation's terms, because [redacted] did not assert that it would charge a [redacted] overhead rate on task orders distant from its [redacted]. Gov't Reply to Pl.–Int. at 4. Furthermore, whether [redacted] believed it could use a [redacted] overhead rate on future task orders is a matter of

contract administration "beyond this Court's purview in a bid protest." Gov't Reply to Pl.–Int. at 4–5 (citing *Chapman Law Firm v. United States*, 63 Fed.Cl. 519, 527 (2005) (determining that a "contractor's actual compliance with [a] provision is a matter of contract administration")).

**c. Defendant–Intervenor [redacted]'s Response.**

[redacted] responds that the Army appropriately evaluated [redacted]'s total price, because the Solicitation required a "price realism analysis, not a cost realism analysis." [redacted] Resp. to Pl.–Int. at 1 (citing AR Tab 83 at 5139). "'Price analysis is the process of examining and evaluating a *proposed price without evaluating its separate cost elements and proposed profit.*'" [redacted] Resp. to Pl.-Int. at 1 (quoting FAR 15.404–1(b) (emphasis added)). Because [redacted]'s total price was within the price realism range (15% of the IGE), the Army did not act arbitrarily in concluding it was realistic. [redacted] Resp. to Pl.–Int. at 2.

**d. The Court's Resolution.**

As discussed above, the Solicitation gave the Army the ability to consider and reject unrealistically priced proposals. As such, the Army did not ignore the terms of the Solicitation when it awarded a MATOC Contract to [redacted], despite the fact that [redacted]'s proposal was outside the price realism range. AR Tab 83 at 5139 ("Offers found to be unreasonably high or unrealistically low may be considered unacceptable and may be rejected on that basis."). The Army was required to downgrade non-price ratings, only if the Army deemed the price proposal unrealistic. AR Tab 3 at 189. The Army concluded that [redacted]'s price was not unrealistic. AR Tab 123 at 7178–79 (SSEB Final Revised Report). Therefore, no adjustment to [redacted]'s non-price ratings was required.

J & J's separate challenge to the consistency of the Army's price realism analysis also is without merit. The Army compared each proposal's total price with the IGE. AR Tab 123 at 7186, 7188, 7190, 7192, 7194, 7196, 7198, 7200. Despite J & J's argument to the contrary, the Army's analysis of [redacted] did not focus on Total Cost to Prime. AR

Tab 123 at 7178. Instead, the Army concluded that [redacted]'s proposal would have been within the price realism guideline (plus or minus 15% of IGE), if [redacted]'s construction G & A overhead rate and profit margin were at IGE levels. AR Tab 123 at 7178. Therefore, [redacted]'s total price was within the 15% of IGE guideline. AR Tab 123 at 7188 (listing a difference of [redacted]% between [redacted]'s total price and the IGE). As a result, the Army acted consistently with its price-to-IGE comparison. AR Tab 123 at 7188–7200.

■ Nevertheless, the court finds it troubling that one of the Army's arguments for finding [redacted]'s price reasonable was not accurate at the time it was first made. The December 1, 2011 revision of the SSEB Report incorrectly asserted that replacing profit and G & A overhead in [redacted]'s proposal with the IGE rates "would bring [[redacted]'s] proposed overall prices into the realistic range." AR Tab 103 at 6681. In fact, as J & J points out, using the data in the December 1, 2011 SSEB Report, [redacted]'s price still would have been 22.4% below the IGE, far outside the realistic range.[22] But, the Government is correct that the December 1, 2011 Report was not final. *Compare*

AR Tab 103 (Dec. 1, 2011 Report) *with* AR Tab 123 (Feb. 14, 2012 Final Report).

■ The bottom line is that on December 1, 2011, the Army's conclusion that "application of the IGE's Q & A overhead rate ([redacted]%) and profit margin ([redacted]%) would bring their proposed overall prices into the realistic range," was not accurate. But, by the date the final award was made—it was true. *Compare* AR Tab 103 at 6696–97 *with* AR Tab 123 at 7197–98 *and* AR Tab 103 at 6681 (assertion in Dec. 1, 2011 Report); AR Tab 123 at 7178 (repeating text from the Dec. 1, 2011 Report); AR Tab 123 at 7197–98 (stating revised cost figures).[23] This is because the evidence changed to fit the rationale, rather than the rationale changing to fit the evidence. Nonetheless, the Army articulated "a satisfactory explanation for its action" and provided a "rational connection between the facts found and the choice made." *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. 2856.

For these reasons, the court has determined that the Army did not act arbitrarily and capriciously in its final price realism analysis of the [redacted] and [redacted] proposals.

---

22. The Government urges the court to ignore this inconvenient fact. First, the Government argues that J & J waived this argument by raising it in a Reply Brief. Gov't Reply to Pl.–Int. at 7 n. 2 (citing *Novosteel SA*, 284 F.3d at 1274). The procedural concern addressed in *Novosteel*, however, is not present in this case, because the Government had an opportunity to respond—and did respond—to the "new" argument. *Cf. Novosteel SA*, 284 F.3d at 1274 ("[T]he non-moving party ordinarily has no right to respond to the reply brief[.]"). Because the timing of J & J's argument did not prejudice the Government, it is not waived. Second, the Government argues that J & J did not adequately explain how it performed its calculations. Gov't Reply to Pl.–Int. at 7. Here, the Government ignores the fact that the Army is required to establish that the Administrative Record supports its exercise of discretion. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. 2856. J & J did no more than simply replicate the Army's price realism analysis calculation. Pl.–Int. Reply at 6.

The Administrative Record, however, provides the court with the information necessary to verify J & J's assertion that the Army misstated the effect of substituting the IGE rates for profit

([redacted]%) and construction G&A and overhead ([redacted]%) for the figures that [redacted] used. Pl.–Int. Reply at 5–6 (citing AR Tab 103 at 6681, 6696–97). That calculation is 1 – (($[redacted] total cost to prime + $[redacted] taxes) × (1 + [redacted] construction G & A and overhead) + $[redacted] bond) × (1 + [redacted] profit) + $[redacted] total design costs) / $[redacted] IGE total price) = 0.224, or 22.4%, the amount that [redacted]'s originally proposed total price would still fall below the IGE total price, even with the rate substitutions the Army described. This amount matches J & J's representation and contradicts the Army's December 1, 2011 assertion that the substitutions would bring [redacted]'s total price within the "realistic range" of plus or minus 15%. AR Tab 103 at 6681; *see also* Pl.–Int. Reply at 6.

23. This calculation is 1 – (($[redacted] total cost to prime + $[redacted] taxes) x (1 + [redacted] construction G&A and overhead) + $[redacted] bond) x (1 + [redacted] profit) + $[redacted] total design costs) / $[redacted] IGE total price) = 0.126, or 12.6%, which is within the "realistic range" of plus or minus 15%. AR Tab 123 at 7178.

### 2. The Army's Failure To Raise Affordability.

#### a. The Plaintiff–Intervenor's Argument.

J & J's August 30, 2012 Complaint–In–Intervention alleges that the Army violated FAR 15.306, requiring that agency discussions be meaningful. Compl.–Int. ¶ 42. The Army determined that J & J's price was " 'Not affordable' for the sample project," but did not advise J & J, at the time of discussions that its proposed price exceeded the affordability ceiling. Pl.–Int. Mot. JAR at 12 (citing AR Tab 87 at 5242 (showing J & J's price proposal was $[redacted] at the time of discussions), AR Tab 144 at 7695 (showing the "Not Affordable" rating), and AR Tab 83 at 5139 (showing the $[redacted] affordability ceiling)). Therefore, J & J argues that the Army "knew that J & J's price was above the affordability ceiling yet did not alert J & J to this fact so it was able to remedy this problem." Pl.–Int. Mot. JAR at 12. Had J & J been informed that its price was too high, it would have lowered it. Pl.–Int. Mot. JAR at 36.

#### b. The Government's Response.

The Government responds that there is an important distinction between the Army's determination that J & J's proposal was " 'Not affordable' for the sample project" and its decision not to award J & J a MATOC Contract. Gov't Resp. to Pl.–Int. at 41. J & J's focus on the sample project, however, is "misleading and should be disregarded." Gov't Resp. to Pl.–Int. at 41. The Army determined that J & J's initial price of $[redacted] was "unreasonable" and informed J & J that the unrestricted price objective for awarding a MATOC Contract was $[redacted] to $[redacted]. Gov't Resp. to Pl.–Int. at 41 (citing AR Tab 108 at 6763). The Army's discussions with J & J cited no affordability concerns, because that "was not an evaluation consideration for the MATOC program." Gov't Resp. to Pl.–Int. at 41. With regard to the award decision, the Army explicitly advised J & J that, although its price was "considered 'Not Affordable' for purposes of the sample task order[,] . . . the 'affordability' issue does not exclude J & J from consideration of award of [a] base contract in the MATOC pool[.]" Gov't Resp. to Pl.–Int. at 42 (quoting AR Tab 128 at 7291 (Memorandum from Source Selection Authority) (first two alterations added in the brief)). Therefore, the Army's decisions regarding J & J were neither misleading nor prejudicial. Gov't Resp. to Pl.–Int. at 42–43.

#### c. The Court's Resolution.

FAR 15.306 requires an agency to "indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond." 48 C.F.R. § 15.306. Deficiencies are "material failures of a proposal to meet a Government requirement." AR Tab 3 at 160. A price outside the affordability range was a material failure with respect to the sample task order, but not respect to the award of a MATOC Contract. AR Tab 83 at 5139 (explaining that affordability was required for the sample task order, but *not for* a MATOC Contract).

J & J's August 30, 2012 Complaint–In–Intervention "protest[s] the [Army's] improper decision not to award J & J a Multiple Award Task Order Contract[.]" Compl.–Int. ¶ 1; *see also id.* at 23–25 (listing J & J's requested relief with respect to MATOC contracts but omitting any mention of the sample task order). The Administrative Record shows that "affordability" was not a factor in that decision. AR Tab 128 at 7291 ("[T]he 'affordability' issue does not exclude J & J from consideration of award of [a] base contract in the MATOC pool[.]"). Although J & J argues that "[t]he evaluation for the MATOC awards and the seed task order award was one and the same" (Pl.–Int. Reply at 17), J & J points to no evidence in the Administrative Record indicating that the Army misapplied its "affordability" analysis to the MATOC Contract award.

For these reasons, the court has determined that the Army's failure to raise "affordability" in its discussions with J & J did not violate FAR 15.306.

### 3. The Army's Acceptance Of Blank Line Items.

#### a. The Plaintiff–Intervenor's Argument.

In this case, the Solicitation also required "proposals to include a value for each line

item in the cost/price summary and classified blanks in the line items deficiencies, *i.e.* '*material failures of a proposal to meet a Government requirement.*'" Pl.-Int. Mot. JAR at 14–15 (citing AR Tab 3 at 160 (definition of "deficiency"); AR Tab 83 at 5139 (request that there be "no blanks remaining"); AR Tab 109 at 6768 (Army initially found deficiencies for each blank in [redacted]'s proposal)). [redacted], [redacted], and [redacted] left blanks in their proposals. AR Tab 119 at 6925 (a blank for [redacted] in [redacted]'s final proposal revisions). AR Tab 118 at 6913 (blanks for [redacted], [redacted], [redacted], [redacted], [redacted], and [redacted] in [redacted]'s final proposal revision). Because the aforementioned offerors failed to conform their proposals to the material terms and conditions of the Solicitation, the Army's award of MATOC Contracts to those offerors was unlawful.

### b. The Government's Response.

The Government responds that, although the Solicitation states that proposed contract line items "shall be filled out with no blanks remaining" (AR Tab 83 at 5139), a blank space for a contract line item was not a "deficiency" that would render the proposal ineligible for consideration. Gov't Resp. to Pl.-Int. at 14. Instead, blank spaces for contract line items are considered "minor and immaterial." Gov't Resp. to Pl.-Int. at 14 (citing *Andersen Consulting v. United States,* 959 F.2d 929, 932 (Fed.Cir.1992) ("Any good lawyer can pick lint off any Government procurement, pundits say. We will not set aside an award, even if violations of law are found, unless those violations have some significance.")). The Government further contends that [redacted] did not leave items blank, but "filled in every item with either a 'number' or a 'dash.'" Gov't Resp. to Pl.-Int. at 16 (citing AR Tab 116 at 6862).

### c. Defendant–Intervenor [redacted]'s Response.

[redacted]'s failure to fill in a line item with a zero "cannot reasonably be considered a material failure." [redacted] Resp. to Pl.–Int. at 3–4 (citing *Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d 955, 960 (Fed.Cir.1993) ("[S]mall or immaterial errors are generally not adequate grounds for a successful pro-

test.")). [redacted] asserts that the context made it clear that the blank line item represented "a zero bid," because the "[redacted]" subtotal was equal to the "[redacted] [redacted]" line item. [redacted] Resp. to Pl.–Int. at 4 (citing AR Tab 119 at 6925). Alternatively, even if a zero figure could not be inferred from the blank line item, the omission was not material because other offerors' [redacted] [redacted] costs represented such a small percentage of their overall prices. [redacted] Resp. to Pl.–Int. at 4 (citing AR Tab 123 at 7183 (showing that J&J's [redacted] insurance cost represented $[redacted] of its $[redacted] overall price)). A procurement should not be overturned based on an omission so small. [redacted] Resp. to Pl.–Int. at 4.

### d. The Court's Resolution.

 "[A] proposal that fails to conform to the material terms and conditions of the [S]olicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statute and regulations." *E.W. Bliss Co.,* 77 F.3d at 448. That case, however, ends with the admonition: "Although it may be true that 'a proposal which ultimately fails to conform to material terms of the solicitation should be considered unacceptable,' '[w]here a defect in a bid is trivial or a mere formality, not material, the bid is not required to be rejected out of hand.'" *Id.* at 449 (quoting *M.W. Kellogg Co./Siciliana Appalti Costruzioni v. United States,* 10 Cl.Ct. 17, 26 (1986)). As such, a defect in a proposal is considered, as a matter of law, to be "immaterial when the effect on price, quantity, quality, or delivery is negligible[.]" FAR 14.405. Leaving a line item blank, instead of using a zero, did not materially affect the proposals in this case. *See Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 1000 (Fed. Cir.1996) ("*De minimis* errors are those that are so insignificant when considered against the solicitation as a whole that they can safely be ignored and the main purposes of the contemplated contract will not be affected if they are."). In addition, this oversight did not deprive the Army of any information, let alone have any effect on the factors enumerated in the FAR definition of materiality. *See* FAR 14.405 (allowing the contracting

officer to waive any deficiency resulting from a minor informality or irregularity); *see also* AR Tab 119 at 6926 (explaining the blank line item under in [redacted] [redacted] in [redacted]'s proposal signified that [redacted] [redacted] "[i]s included in our [redacted] and does not apply separately").

Because leaving line items blank was a minor defect, the court has determined that the Army did not violate FAR 14.405 nor act in an arbitrary manner in awarding [redacted], [redacted], and [redacted] MATOC Contracts on this basis. *See Grumman Data Sys. Corp. v. Widnall*, 15 F.3d 1044, 1048 (Fed.Cir.1994) ("[S]mall errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement.").

### 4. The Army's Acceptance Of $0 Line Items.

#### a. The Plaintiff–Intervenor's Argument.

The Solicitation required that offerors provide separate prices for [redacted] and [redacted]. AR Tab 83 at 5138–39 (requiring completion of the Project Pricing Template, without blank line items); AR Tab 79 at 5031 (Project Pricing Template, with separate line items for [redacted] and [redacted]). J & J argues that "[redacted], [redacted], and [redacted] failed to separate [redacted] and [[redacted]] costs, thereby materially deviating from the requirements of the Solicitation." Pl.–Int. Mot. JAR at 17 (citing AR Tab 116 at 6862([redacted]), AR Tab 114 at 6839([redacted]), and AR Tab 111 at 6778([redacted])).

Specifically, [redacted] combined [redacted] and [redacted] into one line item, and [redacted] also "appears to have" done the same. Pl.–Int. Mot. JAR at 17. [redacted] represented that it did not apply [redacted] and [redacted] as a percentage of material costs and "[t]herefore $0 and 0% are submitted for this line item breakdown." AR Tab 117 at 6889. Therefore, J & J insists that "[redacted]'s allegation of $0 in [redacted] and [redacted] loses all credibility ... [be-

cause] [redacted] states that the costs associated with [redacted] [redacted] are 'included in [redacted].'" Pl.–Int. Mot. JAR at 17 (citing AR Tab 111 at 6778 (listing $0 for [redacted] and [redacted])).[24]

J & J also asserts that the awardees' failures to provide separate [redacted] and [redacted] costs were a material deviation from the Solicitation and for that reason, the MATOC Contracts awarded to date should be set aside. Pl.–Int. Mot. JAR at 17–18.

#### b. The Government's Response.

The Government responds that [redacted] and [redacted] did not deviate from the Solicitation when they listed $0 for [redacted], because the Solicitation stated that "zero values may be used." Gov't Resp. to Pl.–Int. at 17 (quoting AR Tab 83 at 5139). Furthermore, "[redacted] provided a facially valid reason for its accounting practices ... [when it stated that] "its '$0' rates for [redacted] and [redacted] were '[i]n accordance with [redacted] corporate and federal audited rates[.]'" Gov't Resp. to Pl.–Int. at 18 (quoting AR Tab 117 at 6889). Also, [redacted]'s parenthetical explanation that [redacted] [redacted] costs were "included in [redacted]" was not consistent with its $0 [redacted], because it was plausible that [redacted] had no [redacted] [redacted] costs. Gov't Resp. to Pl.–Int. at 18 (citing AR Tab 114 at 6839 (showing [redacted]'s $0 in liability insurance costs)). The Government adds that, "[e]ven if [redacted]'s approach is not ideal in terms of accounting, [redacted]'s representations fully complied with the RFP." Gov't Resp. to Pl.–Int. at 18. If [redacted] did commit an error, it was not sufficient to invalidate the procurement. Gov't Resp. to Pl.–Int. at 18–19.[25]

#### c. Defendant–Intervenor [redacted]'s Response.

The Army questioned [redacted]'s $0 figures for construction G & A and construction overhead and was "clearly satisfied with [redacted]'s response, [and] determined that

---

**24.** J & J did not provide a citation to the "included in G & A" text, found at AR Tab 117 at 6889.

**25.** The Government, however, did not address [redacted]'s failure to list separate values for construction G & A and overhead, nor did [re-

dacted] address this issue. Gov't Resp. to Pl.–Int. at 13–19; [redacted] Resp. to Pl.–Int. at 1–2 (adopting and concurring in Gov't Resp. to Pl.–Int.).

[redacted]'s pricing was reasonable and realistic." [redacted] Resp. to Pl.–Int. at 17 (citing AR Tab 111 at 6778 (asking [redacted] to verify or explain its figures); AR Tab 117 at 6889 (explaining [redacted]'s accounting); AR Tab 123 at 7182 (rating [redacted]'s pricing "Reasonable & Realistic")). [redacted] further explains that the $0 figure for [redacted] [redacted] was within its business discretion and also notes that [redacted]'s proposal stated that it would obtain the required bonds and insurance. [redacted] Resp. to Pl.–Int. at 18 (citing AR Tab 90 at 5785 (scheduling a ten-day window for obtaining bonds and insurance)). "[I]t is likely that [redacted] on the one hand, and J & J and Linc on the other hand, simply chose to price their respective proposals differently." [redacted] Reply to Pl.–Int. at 2–4 (comparing [redacted]'s $0 construction [redacted] and [redacted] line items with J & J and Linc's $0 line items for subcontract handling charge).

### d. The Court's Resolution.

■ The Solicitation specifically stated that "zero values may be used" in filling out the line-item schedule. AR Tab 83 at 5139. Therefore, J & J incorrectly argues that a template with separate line items for [redacted] and [redacted] required offerees to list non-zero values for both. The Administrative Record certainly shows that [redacted] deviated from the template by combining the two line items into one. *Compare* AR Tab 79 at 5031 (Project Pricing Template, with separate line items for [redacted] and [redacted]), *with* AR Tab 116 at 6862 ([redacted]'s completed pricing template, with one line item for "[redacted]"). But, that deviation was immaterial. *See* FAR 14.405 (defining as immaterial any deviation for which the "effect on price, quantity, quality, or delivery is negligible" and allowing the Contracting Officer to waive any deficiency resulting from a minor informality or irregularity). In addition, [redacted] did not, utilize a combined line item for [redacted] and [redacted], but instead listed [redacted] as $0 and [redacted] as $81,254.18. AR Tab 114 at 6839. [redacted]'s $0 [redacted] and [redacted]'s listing of a $0 value for both [redacted] and [redacted] were consistent with the Solicitation's statement that "zero values may be used." AR Tab 83 at 5139. Therefore, [redacted] and

[redacted] did not deviate from the Solicitation and [redacted]'s deviation was immaterial.

For these reasons, the court has determined that the Army did not violate the FAR nor act in an arbitrary manner in awarding [redacted], [redacted], and [redacted] MA-TOC Contracts. *See Grumman Data Sys. Corp.,* 15 F.3d at 1048 (holding that a departure from standard accounting principles does not invalidate a contract award where the resulting error is *de minimis*).

### 5. The Army's Acceptance Of A $0 Tax Line Item.

### a. The Plaintiff–Intervenor's Argument.

In this case, the Solicitation required inclusion of "all applicable Federal, State, and local taxes and duties." Pl.–Int. Mot. JAR at 19 (citing AR Tab 3 at 214 (quoting and incorporating FAR 52.229–3) and AR Tab 79 at 5031 (listing "TAXES (IF APPLICABLE)," as a line item in the Project Pricing Template)). [redacted]'s final proposal revision lists "$0" for taxes and asserts that "Federal projects are exempt in the state of [redacted] from [redacted] tax." Pl.–Int. Mot. JAR at 19 (citing AR Tab 118 at 6914). J & J, however, counters that [redacted]'s omission of [redacted] taxes materially violated the Solicitation requirements, precluded accurate price comparisons with competing proposals and "prejudiced offerors whose cost/price summary was higher than [redacted]'s." Pl.–Int. Mot. JAR at 19 (citing *Westinghouse Elec. Corp.,* B–227091, 1987 WL 102676 (Comp.Gen. Aug. 10, 1987) (sustaining a protest where the awardee violated the solicitation by not including taxes in its price)).

### b. The Government's Response.

The Government responds that [redacted]'s proposal complied with the Solicitation by including all the taxes that [redacted] deemed applicable. Gov't Resp. to Pl.–Int. at 19–20 (citing AR Tab 3 at 214 (incorporating FAR 52.229–3, containing the word "applicable") and AR Tab 79 at 5031 (listing "TAXES (IF APPLICABLE)," as a line item in the Project Pricing Template)). If [redacted] was incorrect about the tax exempt status of the

project, [redacted] assumes this risk. Gov't Resp. to Pl.–Int. at 20. Defendant–Intervenor [redacted]'s Response.

### c. Defendant-Intervenor [redacted]'s Response.

First, [redacted] asserts that the Government's interpretation of [redacted] tax law is correct. [redacted] Resp. to Pl.–Int. at 12–13 (citing [redacted] (2012) (exempting from [redacted] tax "[redacted]")). Second, [redacted] asserts that even if its interpretation of [redacted] tax law were incorrect, "submitting a below-cost bid for an element of cost does not render a proposal non-responsive." [redacted] Resp. to Pl.–Int. at 13 (noting that "[redacted]'s proposal nowhere takes explicit exception to FAR 52.229–3").

### d. The Court's Resolution.

■ The Army questioned [redacted]'s $0 line item regarding taxes (AR Tab 111 at 6778), and [redacted] responded that no taxes were applicable. AR Tab 118 at 6914. Award of a MATOC Contract to [redacted], however, was not arbitrary because [redacted] bore the risk of any tax liability.

For these reasons, the court has determined that the Army's evaluation of [redacted]'s price, and its decision to offer [redacted] a MATOC Contract based on that price, were not arbitrary. In addition, because [redacted] complied with the terms of the Solicitation, that allowed the use of zero values for line items (AR Tab 83 at 5139), the court has determined that the Army appropriately relied on FAR 52.229–3, that "unambiguously places the responsibility for determining whether an exemption is available under a contract on the contractor." *Hunt Const. Group, Inc. v. United States*, 48 Fed.Cl. 456, 459 (Fed.Cl.2001), *aff'd*, 281 F.3d 1369 (Fed. Cir.2002).

### 6. The Army's Failure To Recognize That An Offeror Had Unequal Access To Information And To Mitigate.

### a. The Plaintiff–Intervenor's Argument.

The Contracting Officer is responsible for determining if an offeror has had unequal access to information and for mitigation. Pl.–Int. Mot. JAR at 24 (citing AR Tab 3 at 258–60). [redacted] had unequal access to information, because of its prior work on

[redacted]. Pl.–Int. Mot. JAR at 24 (citing AR Tab 7149 (awarding [redacted] a significant strength, "based on lessons learned from the offeror's existing [redacted] work, [*i.e.*,] they … identified a method for [redacted].")). Therefore, J & J argues that "there was no consideration given to the prejudice to competing offerors caused by this [Organizational Conflict of Interest ("OCI")]." Pl.–Int. Mot. JAR at 25. Specifically, [redacted]'s knowledge of [redacted] afforded [redacted] pricing and scheduling advantages not available to other offerors, and "the only way to properly mitigate this OCI [was] to rescind the award to [redacted] or start the proposal process from the beginning[.]" Pl.–Int. Mot. JAR at 25–27.

### b. The Government's Response.

The Government responds that "J & J's entire argument rests on the unsupported assumption that [redacted] was aware that [redacted] (a project managed by [redacted]), and that it could use this [redacted]." Gov't Resp. to Pl.–Int. at 27. In fact, no prior [redacted] existed, but [redacted] proposed [redacted]. Gov't Resp. to Pl.–Int. at 27–28 (citing AR Tab 88 at 5471–72). Therefore, [redacted] did not rely on non-public information, but instead proposed use of "its own proprietary device." Gov't Resp. to Pl.–Int. at 28 & n. 6 (citing FAR 15.306(e)(2) and FAR 15.207(b) for the proposition that "the Government has no basis to give one offeror another offeror's proprietary proposal concepts"). Moreover, any advantage that [redacted] gained from prior work at [redacted] did not constitute an OCI. Gov't Resp. to Pl.–Int. at 29 (quoting *ARINC Eng'g Servs., LLC v. United States*, 77 Fed.Cl. 196, 203 (2007) ("[A]n agency is not required to compensate for every competitive advantage gleaned by a potential offeror's prior performance of a particular requirement.… There is no basis to object to an offeror's advantage unless it is created by an improper preference or other unfair action by the procuring agency.")). The Government adds that, even if an OCI existed, it would trigger the duty to mitigate only if it were "significant." Gov't Resp. to Pl.–Int. at 29–30 (citing FAR 9.504(a)). The bottom line is J & J did not establish the existence of a "signifi-

cant" conflict of interest. Gov't Resp. to Pl.–Int. at 30.

### c. The Court's Resolution.

██ The United States Court of Appeals for the Federal Circuit has held that "[t]he mere existence of a prior or current contractual relationship between a contracting agency and a firm does not create an unfair competitive advantage, and an agency is not required to compensate for every competitive advantage gleaned by a potential offeror's prior performance of a particular requirement[.]" *PAI Corp. v. United States*, 614 F.3d 1347, 1353 (Fed.Cir.2010) (quoting *AR-INC Eng'g Servs., LLC*, 77 Fed.Cl. at 203). FAR 9.504(a) requires that a contracting officer "[a]void, neutralize, or mitigate significant potential conflicts" (no such conflict exists, unless there is "an *unfair* competitive advantage." *PAI Corp.*, 614 F.3d at 1353 (emphasis added). In this case, however, the Army was not required to mitigate any competitive advantage [redacted] gleaned from prior work at [redacted], unless [redacted] unfairly gained some special knowledge as a result. *Id.* The Administrative Record evidences no "unfair competitive advantage."

For these reasons, the court has determined that no OCI was associated with [redacted]'s proposal and consequently no mitigation was required by the Contracting Officer.

### 7. The Army's Best Value Tradeoff.

### a. The Plaintiff–Intervenor's Argument.

Although J & J cured two Factor 1 weaknesses in its proposal, the Army's rating rationale concluded that J & J's proposal contained two weaknesses. Pl.-Int. Mot. JAR at 31–32 (citing AR Tab 123 at 7155 (Final SSEB Report) (advising J & J that "[t]he approach includes ... two weaknesses," but listing the former weaknesses in strikethrough type and describing how these weaknesses were cured) and AR Tab 144 at 7693 (post-award debriefing that "[t]his approach includes ... two weaknesses," but not informing J & J of either)). J & J asserts that if the Army based its rating of J & J on accurate information, its proposal would have been rated technically superior to those of [redacted] and [redacted], and J & J would

have been awarded a MATOC Contract. Pl.-Int. Mot. JAR at 32.

### b. The Government's Response.

The Government states that "an obvious clerical error" caused the two inaccurate references to J & J's weaknesses. Gov't Resp. to Pl.–Int. at 38. The Government also points out that the Source Selection Authority's "Final Decision and trade-off analysis did not mention any weaknesses for J & J." Gov't Resp. to Pl.–Int. at 39 (citing AR Tab 128 at 7292–94 (justifying J & J's Factor 1 rating of [redacted], based on the "cumulative effect" of its strengths giving "no more assurance than above average performance ... which is the hallmark of a '[redacted]' rating")). But, the Government argues that "[t]here is no requirement that an agency must change an offeror's technical scores when the offeror's identified strengths or weaknesses improve from an initial evaluation to a final evaluation." Gov't Resp. to Pl.–Int. at 39 (quoting *Akal Sec., Inc. v. United States*, 103 Fed.Cl. 310, 332 (2011)).

### c. The Court's Resolution.

The Army made the choice to rate J & J's proposal "[redacted]" under Factor 1, after it found that J & J had cured two weaknesses. AR Tab 123 at 7155. But, the Army failed on two separate occasions, to "articulate a satisfactory explanation for its action" and provide a "rational connection between the facts found and the choice made." *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. 2856. Both the SSEB Final Report's rating rationale and the Contracting Officer's debriefing of J & J stated that "[J & J's] approach includes ... two weaknesses," after all weaknesses under Factor 1 were removed. AR Tab 123 at 7155; AR Tab 144 at 7693; *see also Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. 2856 (stating that agency action would be arbitrary and capricious, if the agency "offered an explanation for its decision that runs counter to the evidence before the agency").

The Administrative Record in this case includes a third explanation for the Army's decision to rate J & J's proposal "[redacted]" under Factor 1. AR Tab 128 at 7292–94 (Source Selection Decision). The Source Se-

*lection Decision* omits any reference to the aforementioned non-existent weaknesses, and it also provides a satisfactory explanation that connects the facts found and the choice made regarding best value tradeoffs and Source Selection. AR Tab 128 at 7292–94 (justifying J & J's Factor 1 rating of [redacted], based on the "cumulative effect" of its strengths but affording "no more assurance than above average performance ... which is the hallmark of a '[redacted]' rating"). To his credit, the Source Selection Authority stated that he conducted his own ratings analysis and did not adopt the SSEB rating rationale nor the misstatement that J & J's proposal contained two weaknesses under Factor 1. AR Tab 128 at 7291. As such, the Administrative Record contains no evidence connecting the Army's decisions to the misstatements in the SSEB Final Report and the Contracting Officer's subsequent debriefing of J & J. *Cf. Stevens v. United States,* 21 Cl.Ct. 195, 202 (1990) (observing that inconsistencies in the Administrative Record are not dispositive if the final decision had a basis therein).

For these reasons, the court has determined that the Army did not rely on inaccurate information in making its best value tradeoff and that the Source Selection decision was not arbitrary.

### 8. The Army's Reliance On Raw Price As A Discriminator.

#### a. The Plaintiff–Intervenor's Argument.

J & J argues that the Army "improperly deviated from its evaluation criteria by considering raw proposal prices in the best-value tradeoff[,] instead of the evaluated price subfactors listed in the Solicitation." Pl.–Int. Mot. JAR at 33 (citing AR Tab 83 at 5132 (stating that "[a]ll evaluation factors other than cost or price, when combined, are significantly more important than cost or price"); AR Tab 83 at 5139 (listing the five price subfactors: fairness; reasonableness; realism; unbalancing; and affordability); AR Tab 144 at 7698 (debriefing letter stating that the proposals of awardees [redacted] and [redacted] were "technically equal" to J & J's, but "[t]he discriminator was the lower price" in their proposals)). The trade-off analysis in the Source Selection Decision re-

fers to the total prices in the proposals, instead of price subfactors. Pl.–Int. Mot. JAR at 33–34 (citing AR Tab 128 at 7277–79). Therefore, J & J asserts that the Army's reliance on raw price as a discriminator was prejudicial to J & J for two reasons. Pl.–Int. Mot. JAR at 34. First, despite the Army's conclusion to the contrary, the proposals of [redacted] and [redacted] were not realistic. Pl.–Int. Mot. JAR at 34. Had the Army found those proposals unrealistic and properly evaluated the proposals, based on the price subfactors, J & J would have been awarded a MATOC Contract. Pl.–Int. Mot. JAR at 34. Second, even if the proposals of [redacted] and [redacted] were realistic, the Army should have used the Phase I ratings as a tiebreaker. Pl.–Int. Mot. JAR at 34 (citing AR Tab 83 at 5139). Had the Army done so, "it is reasonably likely that J & J would have won, as it received maximum ratings in all Phase I categories." Pl.–Int. Mot. JAR at 34–35 (citing AR Tab 74 at 4896 (showing that although J & J's ratings were not the highest, they were identical to [redacted]'s, but not as strong as those of [redacted])).

#### b. The Government's Response.

The Government responds that the Solicitation did not require a "separate weighing" of individual proposals, based on "fairness, balance, reasonableness, realism[,] and affordability." Gov't Reply to Pl.–Int. at 44. Instead, the Army used price to discriminate among all technically equal proposals. Gov't Reply to Pl.–Int. at 44. The Solicitation required the Army to select offerors "whose proposals offer the best overall value to the Government." Gov't Reply to Pl.–Int. at 45 (citing AR Tab 83 at 5131). Of course, the Solicitation provided that Phase I ratings would be considered as a tie-breaker, but only when there was "a need to 'differentiate between essentially equal competitive offerors.'" Gov't Reply to Pl.–Int. at 47 (quoting AR Tab 83 at 5131). There is a difference between "technically equal" and "essentially equal competitive offerors," and J & J's proposal was not "essentially equal" to those of [redacted] and [redacted]. Gov't Reply to Pl.–Int. at 47. Accordingly, the Source Selection Authority acted within his discretion under FAR 15.101–1(c) to make approximate trade-

offs between cost or price and non-cost factors. Gov't Reply to Pl.–Int. at 48.

### c. The Court's Resolution.

Despite the Government's argument to the contrary, the Solicitation required the Army to evaluate each of the listed subfactors for Factor 5. AR Tab 83 at 5131 ("The Government will evaluate the price proposal for fairness, reasonableness, realism, unbalancing, and affordability."). The Administrative Record evidences that the Army complied with this requirement and each evaluation was binary, *i.e.*, rated either fair or unfair, reasonable or unreasonable. AR Tab 127 at 7275 (Price Negotiation Memorandum showing the ratings); AR Tab 128 at 7290 (Source Selection Decision Memorandum showing the ratings). Nor has J & J cited Solicitation text requiring any evaluation, other than the binary rating that the Army conducted. Moreover, the Solicitation explicitly states that "[p]ricing will not receive an adjective rating." AR Tab 83 at 5142.

■■■■ The Solicitation also requires the Army to award MATOC Contracts to offerors that submitted proposals "represent[ing] the best value to the Government[,] based on the evaluated ratings from Phase 2 proposals, subject to tiebreaker process." AR Tab 83 at 5131. Read in isolation, that statement might support J & J's argument contesting the Army's consideration of raw prices, but such a construction is not permissible. *See Christos v. United States*, 300 F.3d 1381, 1384 (Fed.Cir.2002) ("All of the provisions of a contract must be read in harmony[.]"); *see also Banknote Corp. of Am., Inc.*, 365 F.3d at 1353 n. 4 (stating that the principles for interpreting contracts apply equally to interpreting solicitations). In this case, the Solicitation authorizes the Source Selection Authority to consider raw prices: "[i]f there is a lower priced, conforming offer(s), the Source Selection Authority must determine that the added value of a more expensive proposal for the initial task order would justify award to that Offeror." AR Tab 83 at 5131.

For these reasons, the court has determined that the Army's decision to consider raw price as a discriminator, as it was required to do, was not arbitrary.

### 9. The Army's Evaluation Of Non–Price Items.

#### a. The Plaintiff–Intervenor's Argument.

J & J asserts that the Army improperly assessed its proposal with regard to low flow toilets, its Risk Management Plan, and its fast track plan. Pl.–Int. Mot. JAR at 28–31. Although [redacted] received strengths for use of low flow toilets and for its Risk Management Plan, J & J did not, and J & J contends there was no meaningful difference between J & J's and [redacted]'s proposals. Pl.–Int. Mot. JAR at 28–29. Although J & J's proposal did not use the phrase "low consumption," it did mention 1.6 gallons per flush, *i.e.*, the regulatory definition of "low consumption" and the statutorily-mandated maximum for most toilets. Pl.–Int. Reply at 14 (citing 24 C.F.R. § 3280.607 ("All water closets must be low consumption (1.6 gallons per flush (gpf) closets.") and 42 U.S.C. § 6295(k)(1) (setting 1.6 gpf maximum)). [redacted] received a significant strength for a fast-track plan that was "almost identical to that of J & J," which did not receive a strength. Pl. Mot. JAR at 29. Had the Army been consistent in assessing strengths, J & J asserts, J & J would have received a higher Factor 1 rating and would have been awarded a MATOC contract. Pl.–Int. Mot. JAR at 31.

#### b. The Government's Response.

The Government responds that "courts give [the] greatest deference possible" to an agency's technical evaluation of proposals. Gov't Resp. to Pl.–Int. at 30 (quoting *CRAssociates, Inc. v. United States*, 102 Fed.Cl. 698, 717–18 (2011)). Specifically, as to low-flow toilets, the proposals of J & J and [redacted] where not comparable, because "J & J's proposal focused on different terms that did not emphasize [the low-flow] concept." Gov't Resp. to Pl.–Int. at 31 (comparing [redacted]'s use of the "exact words 'low consumption' " with J & J's use of terms such as "efficient" and "automatic controls"). Although J & J's proposal referred to 1.6 gallons per flush, J & J cites nothing in the Administrative Record establishing that 1.6 gallons per flush is a low-flow toilet. Gov't Resp. to Pl.–Int. at 31. In addition, as to the Risk Management Plan, the Government as-

serts that J & J's differed from [redacted]'s. Gov't Resp. to Pl.-Int. at 32–34 (comparing AR Tab 91 at 5829–30 ( [redacted] ) with AR Tab 83 at 5340–41 (J & J)). Specifically, "[w]hile [redacted] identified significant risks ... [the Army] determined that the risks cited by J & J pose a low threat to the success of the overall project." Gov't Resp. to Pl.–Int. at 32. And, as to the fast track plans, the Government disputes J & J's contention that its fast track plan was "almost identical" to [redacted]'s. Gov't Resp. to Pl.–Int. at 35 ( [redacted] proposed starting a [redacted], and [redacted] specified the time savings from its design approach). In addition, even if J & J received strengths for its use of low flow toilets, for its Risk Management Plan, and for its fast track plan, J & J cannot establish that it would have received a Factor 1 rating of "Outstanding" and a MA-TOC contract. Gov't Resp. to Pl.–Int. at 36–37. The Administrative Record shows that the only proposal rated "Outstanding" under Factor 1 was [redacted]'s, with five Factor 1 strengths, two of which were significant. Gov't Resp. to Pl.–Int. at 36. In contrast, J & J's proposal had [redacted] significant strengths. Gov't Resp. to Pl.–Int. at 37 (citing AR Tab 123 at 7155). Therefore, J & J failed to show prejudice. Gov't Resp. to Pl.–Int. at 37.

### c. The Court's Resolution.

▬▬ J & J failed to establish that the Army acted in an arbitrary manner in declining to give J & J [redacted] for its use of low-flow toilets, for its Risk Management Plan, and for its fast track plan. Regarding the use of low flow toilets, J & J's proposal did not warrant a [redacted] for promising nothing more than compliance with minimum statutory and regulatory requirements. *See* 42 U.S.C. § 6295(k)(1) (setting 1.6 gpf maximum); 24 C.F.R. § 3280.607 ("All water closets must be low consumption (1.6 gallons per flush (gpf)) closets."). J & J's Risk Management Plan differed substantially from [redacted]'s in terms of the risks identified and the solutions proposed. *Compare* AR Tab 91 at 5829–30 ( [redacted] ) *with* AR Tab 83 at 5340–41(J & J). Also, J & J's fast track plan differed substantially from [redacted]'s. *Compare* AR Tab 83 at 5358–62(J & J) *with* AR Tab [redacted] at [redacted] ( [redacted] ).

For example, [redacted]'s proposal states, "[W]e plan to fast track [redacted]." AR Tab [redacted] at [redacted]. Where there are differences in proposals, the Army's decision to rate those proposals differently is not arbitrary. *See E.W. Bliss Co.*, 77 F.3d at 449 (explaining that the evaluation of differing proposals involves "discretionary determinations of procurement officials that a court will not second guess").

For these reasons, the court has determined that the Army's evaluation of the above-referenced non-price items in J & J's proposal was not arbitrary.

### F. A Preliminary Injunction Is Warranted.

The August 20, 2012 Complaint requests that the court "preliminarily and permanently enjoin and set aside the [Army's] decision, actions, and all findings and conclusions that are alleged to support such decision." Compl. at 37. Although Linc's September 19, 2012 Motion For Judgment On The Administrative Record seeks a permanent injunction (Pl. Mot. JAR at 37), the court considers a preliminary injunction more appropriate to the circumstances in this case. *See* 28 U.S.C. § 1491(b)(2) (authorizing the court to "award any relief that the court considers proper, including ... injunctive relief").

▬▬ In considering whether to issue a preliminary injunction the court is required to weigh four factors, *i.e.,.* affect a decision whether to grant a preliminary injunction: "(1) immediate and irreparable injury to the movant; (2) the movant's likelihood of success on the merits; (3) the public interest; and (4) the balance of hardship on all the parties." *U.S. Ass'n of Imp. of Textiles & Apparel v. United States*, 413 F.3d 1344, 1346 (Fed.Cir.2005). "No one factor, taken individually, is necessarily dispositive.... [T]he weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed.Cir.1993).

▬▬ As to the first factor, the Administrative Record evidences violations of the

Competition in Contracting Act, FAR, and/or contains no documents showing that the Army even considered some of Linc's proposed "betterments," much less any discussion of the merits of those proposed "betterments." Without injunctive relief, however, Linc will suffer immediate and irreparable harm by losing the opportunity to be awarded a MATOC Contract. *See Google, Inc. v. United States,* 95 Fed.Cl. 661 (2011) (issuing a preliminary injunction after finding that plaintiff had made a *prima facie* showing of a violation of the Competition in Contracting Act and relevant FAR provisions); *see also Savantage Fin. Servs., Inc. v. United States,* 81 Fed.Cl. 300, 306–08 (2008) (same). Therefore, the first factor weighs in favor of an injunction.

■ As to the second factor, the Administrative Record has established that the Army also evaluated certain of Linc's proposals in any arbitrary manner that was prejudicial to Linc's financial interests. Therefore, Linc has met the second test, *i.e.,* a likelihood of success on the merits. *See PGBA, LLC v. United States,* 57 Fed.Cl. 655, 664 (2003) ("This court has acknowledged that a lost opportunity to compete may constitute an irreparable harm[.]").

■ As to the third factor, in many instances, the Administrative Record in this case contains only the perfunctory summaries of the Army's completed evaluations as reflected in the SSEB's Consensus Proposal Evaluation Worksheets, but does not contain any internal documents from which the consensus worksheets would have been compiled or documents evidencing whether and how the Army evaluated those documents. "A protest case cannot be efficiently processed until production of the administrative record" is provided. RCFC App. C ¶ 23; *see also Google, Inc.,* 95 Fed.Cl. at 679 ("[T]he Administrative Record should include all relevant documents" relating to the procurement process at issue); *PGBA,* 57 Fed.Cl. at 663 ("Clearly the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid."). Therefore, the court has determined that the public interest is served by a preliminary injunction in this case.

■ As to the fourth factor, unfortunately, the Army has been working on this procurement since September 2010. The Government argues that "an injunction would imperil the agency's ability to repair and maintain the infrastructure of military medical facilities throughout the world." Gov't Resp. to Pl.–Int. at 50. The Government also predicts higher costs to taxpayers and poorer outcomes for the patients served by those facilities. Gov't Resp. to Pl.–Int. at 50. Linc counters that it will be harmed if the MATOC Contracts go forward, since it will be denied a fair opportunity to compete. Pl. Mot. JAR at 38; Pl.–Int. Mot. JAR at 38. The hardship that a preliminary injunction will impose on the Army is largely attributed to the Army's lack of care in conducting the evaluation process that has led to two bid protests, both of which, in the court's judgment, could and should have been avoided. For this reason, the court finds that the balance of the hardships favors granting an injunction.

## IV. CONCLUSION.

For these reasons, it is hereby ordered that:

This procurement is remanded to Army "for additional investigation or explanation." *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."). The United States Army and its officers, agents, servants, employees, and representatives are preliminarily enjoined from proceeding with or awarding any MATOC Contracts for the design-build of medical facilities in the United States and overseas pursuant to Solicitation No. W912DY–10–R–0005 or any related procurement, solic-

itation, task order, or activity. *See* RCFC 65(a).[26]

As set forth in RCFC 52.2(b)(1)(B), the remand will expire in six months, during which time the preliminary injunction will be in effect. The court will convene a telephone conference on January 11, 2013 at 3:00 p.m. EST to discuss the status of the remand. *See* RCFC 52.2(b)(1)(D).

**IT IS SO ORDERED.**

26. This Order was issued on December 21, 2012, at 7:00 p.m. (EST).